682 S.E.2d 892

**The STATE, Respondent,**

v.

**Janice M. CLASBY, Appellant.**

**No. 26705.**

Supreme Court of South Carolina.

Heard May 28, 2009.
Decided Aug. 17, 2009.

150

Chief Appellate Defender Joseph L. Savitz, III and Appellate Defender LaNelle C. DuRant, of South Carolina Commission on Indigent Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Harold M. Coombs, Jr., all of Columbia, and Solicitor Robert M. Ariail, of Greenville, for Respondent.

Justice BEATTY.

Janice M. Clasby appeals her conviction for lewd act upon a child,[1] arguing the trial judge erred in admitting evidence of prior bad acts involving the victim for which she was not indicted under the common scheme or plan exception to *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923), and Rule 404(b), SCRE. Pursuant to Rule 204(b), SCACR, this Court certified this appeal from the Court of Appeals. We affirm.

---

1. *See* S.C.Code Ann. § 16–15–140 (2003) ("It is unlawful for a person over the age of fourteen years to wilfully and lewdly commit or attempt a lewd or lascivious act upon or with the body, or its parts, of a child under the age of sixteen years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of the person or of the child.").

## FACTUAL/PROCEDURAL HISTORY

On August 6, 1994, a daughter, B.C., was born to Clasby and Bug Holliday. Although the couple lived together at the time of B.C.'s birth, the couple separated approximately a month and a half later. After the separation, Clasby had physical custody of B.C.

According to Holliday, he did not have contact with B.C. until she was four years old given he "never could find where [Clasby and B.C.] were staying at." Despite this reunion, Holliday stated that he did not establish a relationship with B.C. until she was six years old because Clasby "left again" with B.C. At that time, Holliday was awarded legal custody of B.C. after a family court custody proceeding. Even though the family court granted Clasby visitation, Holliday testified that Clasby did not exercise this right on a regular basis.

When Clasby became homeless in November 2003, Holliday permitted her to move in with him but the two did not maintain a romantic relationship. One month later, Clasby moved out of the home. Clasby did not establish contact with Holliday and B.C. until May 2004 when she sought to exercise her visitation rights. While Holliday was reluctant to permit Clasby to have visitation, he testified he did so in order to be in compliance with the family court order. Shortly thereafter, Holliday made the decision to seek a modification of Clasby's visitation schedule so that he could get "some help from the police if [Clasby] didn't return [B.C.]" and "to keep track of [Clasby] better."

Although the exact date is unclear, B.C. at some point expressed that she no longer wanted to visit with Clasby. Because B.C. would not give a reason for this decision, Holliday decided to send B.C. to Cynthia Still, a licensed professional counselor. Holliday believed that a counselor would help him assess B.C.'s relationship with Clasby prior to another family court proceeding.

On June 23, 2004, Still began the first of twenty-seven counseling sessions with B.C. During the sixth visit, on August 16, 2004, Still noticed that B.C. "seemed different" and appeared "anxious." According to Still, B.C. described "some situations where she had been around a lot of talk that involved sexual issues that she was very uncomfortable with."

In the course of an appointment two days later, B.C. conveyed to Still that she had been sexually abused. In turn, Still relayed to Holliday her concerns for B.C.'s safety.

After receiving this information, Holliday spoke with B.C. who then revealed her claims of sexual abuse. Based on this discussion, Holliday met with law enforcement regarding B.C.'s allegations. B.C. was then interviewed at the Pickens County Sheriff's Office. Following this interview, Clasby was arrested for CSC with a minor, first degree.

In September 2005, a Pickens County grand jury indicted Clasby for CSC with a minor, first degree and lewd act upon a child for offenses that allegedly occurred in June 2004.

At the trial for these offenses in October 2005, the solicitor sought to introduce evidence of prior bad acts involving Clasby with the victim that allegedly occurred prior to the indicted June 2004 incidents. The solicitor asserted that these incidents established "an escalating pattern of abuse that eventually culminated in criminal sexual conduct in the first degree." Clasby's counsel opposed the introduction of the evidence on the ground it did not fit within the *Lyle* exception of common scheme or plan. Following arguments of counsel, the trial judge preliminarily ruled that the evidence could be introduced.

After B.C. began her testimony, the trial judge conducted an *in camera* hearing regarding the alleged prior bad act evidence. B.C. testified that when Clasby came to live with her and Holliday, she and Clasby would bathe together. B.C. testified that she would sit with her back against the bathtub while her mother sat with her back to her. She further testified that as she was washing her mother's hair, Clasby would "put her hair back ... and touch my private and rub it."

B.C. testified that on another occasion she was watching a movie with her mother with a blanket over them in the living room and her mother "rub[bed] her private" inside of her underwear. She further stated that her mother "play[ed] with her private" while the two were sleeping together in her father's bed.

In addition to the incidents that B.C. testified occurred at her father's house, B.C. relayed an incident after her mother moved out of Holliday's home. Following her mother's departure in the spring of 2004, B.C. testified that she would visit her mother at Clasby's father's home. B.C. recounted one time when her mother "rub[bed] her private" and her mother asked her to "suck her breasts."

After outlining these prior incidents, the solicitor questioned B.C. regarding the June 1, 2004 incidents for which Clasby had been indicted. Although B.C. could not remember the exact date, she testified that her mother "put her finger" inside "her private" while they were lying on the floor in the bedroom of Heather Rhoda, Clasby's sister.

At the conclusion of B.C.'s *in camera* testimony, the trial judge ruled the prior bad act evidence was "clear and convincing" and admissible under the "common scheme or plan" exception to *Lyle*.

B.C. gave essentially the same testimony before the jury as she did during the *in camera* hearing. When questioned as to why she did not immediately reveal the abuse, B.C. claimed that her mother told her she would kill her if she told.

During her testimony, Clasby adamantly denied ever touching B.C. in a "sexually inappropriate manner." Through her testimony, Clasby inferred the sexual abuse allegations stemmed from animosity that existed between her and Holliday over their custody and visitation arrangement. Specifically, Clasby testified that Holliday told her "he would do whatever it took to keep [her] away from [B.C.]." In terms of the incidents described by B.C., Clasby explained the alleged misconduct would have occurred when B.C. visited her at Clasby's father's doublewide trailer which was shared by nine other relatives.

Heather Rhoda, Clasby's sister, testified there was no privacy in the trailer given the number of people who resided there. Rhoda claimed that B.C. usually slept with her cousin when she visited and was not alone with Clasby. She described Clasby and B.C. as having a "really good relationship." She further testified that she overheard Holliday tell Clasby that "he would do whatever he had to do to make sure that [Clasby] would not be able see [B.C.] again."

Ultimately, the jury convicted Clasby of lewd act upon a child, but acquitted her of CSC with a minor, first degree. The trial judge sentenced Clasby to fourteen years imprisonment. Clasby appealed her conviction to the Court of Appeals. This Court certified this appeal from the Court of Appeals.

## DISCUSSION

Clasby argues the trial judge erred in admitting B.C.'s testimony in which she described four uncharged incidents of sexual misconduct involving Clasby. Because she was not indicted for these acts, Clasby contends the evidence was inadmissible in that it did not rise to the level of common scheme or plan evidence under *Lyle*. Specifically, Clasby asserts the prior bad acts were "separate in time and had no connection with the incident from which she was charged" and, thus, served only to show that she had a "propensity for child molestation." If the admission of this evidence is found to have been in error, Clasby claims its admission did not constitute harmless error.

██ The trial judge has considerable latitude in ruling on the admissibility of evidence and his decision should not be disturbed absent prejudicial abuse of discretion. *State v. Brazell*, 325 S.C. 65, 78, 480 S.E.2d 64, 72 (1997).

As a threshold matter, the trial judge must initially determine whether the proffered evidence is relevant as required under Rule 401 of the South Carolina Rules of Evidence. Rule 401, SCRE (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

If the trial judge finds the evidence to be relevant, the judge must then determine whether the bad act evidence fits within an exception of Rule 404(b). According to Rule 404(b), evidence of prior crimes or misconduct is inadmissible to prove the specific crime charged unless the evidence tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the proof of the other; or (5)

the identity of the person charged with the present crime. Rule 404(b), SCRE ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent."); *Lyle,* 125 S.C. at 416, 118 S.E. at 807.

"To be admissible, the bad act must logically relate to the crime with which the defendant has been charged." *State v. Gaines,* 380 S.C. 23, 29, 667 S.E.2d 728, 731 (2008). "If the defendant was not convicted of the prior crime, evidence of the prior bad act must be clear and convincing." *Id.*

When considering whether there is clear and convincing evidence of other bad acts, an appellate court is bound by the trial judge's factual findings unless they are clearly erroneous. *State v. Wilson,* 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001). The determination of a witness's credibility is left to the trial judge who saw and heard the witness and is therefore in a better position to evaluate his or her veracity. *Id.* (analyzing prior bad act evidence and finding the appellate court committed error by basing its ruling on its own view of the witness's credibility). If the trial judge concludes there is clear and convincing evidence that the defendant committed the uncharged acts, he or she must determine whether the prior acts fall within the common scheme or plan exception to *Lyle.*

"Where there is a close degree of similarity between the crime charged and the prior bad act, both this Court and the Court of Appeals have held prior bad acts are admissible to demonstrate a common scheme or plan." *Gaines,* 380 S.C. at 30, 667 S.E.2d at 731. "When determining whether evidence is admissible as common scheme or plan, the trial court must analyze the similarities and dissimilarities between the crime charged and the bad act evidence to determine whether there is a close degree of similarity." *State v. Wallace,* 384 S.C. 428, 683 S.E.2d 275 (2009). "When the similarities outweigh the dissimilarities, the bad act evidence is admissible under Rule 404(b)." *Id.*

"Even if prior bad act evidence is clear and convincing and falls within an exception, it must be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *Gaines*, 380 S.C. at 29, 667 S.E.2d at 731; *see* Rule 403, SCRE (providing that evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice); *State v. Gillian*, 373 S.C. 601, 609, 646 S.E.2d 872, 876 (2007) (applying probative versus prejudicial test of Rule 403, SCRE, to "other crimes" evidence). "The determination of the prejudicial effect of the evidence must be based on the entire record and the result will generally turn on the facts of each case." *State v. Fletcher*, 379 S.C. 17, 24, 664 S.E.2d 480, 483 (2008).

We find the trial judge properly admitted the proffered evidence of the four incidents of uncharged sexual misconduct committed by Clasby on B.C. prior to the June 1, 2004 offenses for which she was indicted and tried. The alleged prior bad act evidence reveals a close degree of similarity to the facts of the indicted charges.

All of Clasby's alleged sexual misconduct was directed at the same victim. The incidents described by B.C. occurred each time Clasby reunited with B.C. In November 2003, Clasby moved in with Holliday after becoming homeless. B.C. testified that during this month-long stay, the following incidents occurred: (1) her mother touched her "private" while the two bathed together; (2) her mother "rub[bed] her private" inside of her underwear; and (3) her mother "play[ed] with her private" while the two were sleeping together in her father's bed. After another extended absence, Clasby sought to exercise her visitation rights with B.C. in May 2004. According to B.C., another incident occurred in the spring of 2004 where her mother "rub[bed] her private" and asked her to "suck her breasts" while they were lying on the floor together. Each of the incidents established a pattern of escalating abuse which ultimately culminated in Clasby's digital penetration of B.C. The four prior incidents of sexual misconduct by Clasby reveal the same illicit conduct with B.C. during periods of visitation prior to the June 1, 2004 indicted offenses.

Because a close degree of similarity exists between the crimes charged and the bad act evidence, we hold the proffered evidence satisfied the established requirements for the

admissibility of evidence under the common scheme or plan exception. *See Wallace* (holding that in weighing the similarities and dissimilarities between the crime charged and the bad act evidence a trial court should consider, among other factors, the location where the abuse occurred, the use of coercion or threats, and the manner of the occurrence, for example, the type of sexual battery); *see also State v. Whitener*, 228 S.C. 244, 265, 89 S.E.2d 701, 711 (1955) (recognizing that the common scheme or plan exception "is generally applied in cases involving sexual crimes, where evidence of acts prior and subsequent to the act charged in the indictment is held admissible as tending to show continued illicit intercourse *between* the same parties" (emphasis added)). To the extent Clasby claims the evidence was not "clear and convincing" on the ground B.C. was not definitive in her testimony regarding the time and place of the four incidents, we find any issue regarding B.C.'s credibility was properly evaluated by the trial judge.

Furthermore, under similar circumstances to the instant case, this Court and the Court of Appeals have found prior bad act evidence was properly admitted under the common scheme or plan exception. *See State v. McClellan*, 283 S.C. 389, 392, 323 S.E.2d 772, 774 (1984) (concluding that victim's testimony regarding prior attacks by defendant, which were not the subject of an indictment, was properly admitted under the common scheme or plan exception in trial for CSC with a minor, second degree where testimony showed "the continued illicit intercourse forced upon her by [defendant]"); *State v. Kirton*, 381 S.C. 7, 36, 671 S.E.2d 107, 121–22 (Ct.App.2008) (holding evidence that defendant began touching and committing other sexual misconduct with victim when she was six or seven years old was admissible to show common scheme or plan during trial for the indicted offense of CSC with a minor, second degree on the ground that the "six to seven year pattern of escalating abuse of Victim by [defendant was] the essence of grooming and continuous illicit activity"); *State v. Mathis*, 359 S.C. 450, 464, 597 S.E.2d 872, 879 (Ct.App.2004) (concluding evidence of uncharged sexual misconduct committed by the defendant on the victim three times prior to the indicted offense of CSC with a minor, second degree was admissible where the "three earlier assaults on the victim were all attempted in the same manner and under similar

circumstances"); *State v. Weaverling*, 337 S.C. 460, 471, 523 S.E.2d 787, 792 (Ct.App.1999) (finding victim's testimony regarding pattern of sexual abuse he suffered by the defendant was properly admitted as part of a common scheme or plan exception in trial for CSC with a minor and disseminating harmful material to a minor where the "challenged testimonial evidence of [defendant's] prior bad acts show[ed] the same illicit conduct with the same victim under similar circumstances over a period of several years"). Accordingly, we find a decision to affirm the admission of the prior bad evidence is consistent with our jurisprudence.[2]

■ Finally, we hold the probative value of this evidence substantially outweighed the danger of unfair prejudice to Clasby. Given there was no physical evidence to corroborate

---

**2.** We, however, note the existence of the decision of the Court of Appeals in *State v. Tutton*, 354 S.C. 319, 580 S.E.2d 186 (Ct.App.2003). In *Tutton*, the defendant was convicted of CSC with a minor, second degree and two counts of lewd act upon a child. The charges arose out of allegations from two minor victims, who were sisters, that Tutton "rubbed their butts" and digitally penetrated one of the victims while they were spending the night at Tutton's home. *Id.* at 323, 580 S.E.2d at 188.

On appeal, Tutton claimed the trial judge erred by admitting evidence of uncharged criminal conduct under the common scheme or plan exception. Specifically, Tutton challenged the testimony of the victim identified in the CSC with a minor charge. This victim testified that Tutton sexually assaulted her four or five years prior to the time of the trial. *Id.* at 324, 580 S.E.2d at 189. The victim claimed while spending the night at Tutton's, he forced her to lie on her back and take off her underwear. According to the victim, Tutton then performed oral sex on her and forced her to perform oral sex on him. *Id.* The victim further testified that Tutton threatened to tell her parents that she was misbehaving if she spoke of the incident. *Id.*

The Court of Appeals reversed Tutton's convictions, finding "the similarities in this case are insufficient to support the inference that Tutton employed a common scheme or plan to commit the assaults alleged in this case." *Id.* at 333, 580 S.E.2d at 194. Although the Court of Appeals recognized the incidents involved the same parties and occurred at Tutton's residence, it found the dissimilarities were greater than these similarities. Specifically, the Court of Appeals noted that unlike the charged incident, Tutton threatened the victim after the uncharged incident. Additionally, Tutton did not attempt to assault the victim's sister at the time of the uncharged act with the victim. The Court of Appeals also pointed out that the victims had stayed with Tutton without incident on several occasions during the interim be-

B.C.'s testimony regarding the indicted offenses of CSC with a minor, first degree and lewd act upon a child, we find her testimony of Clasby's sustained illicit conduct was extremely probative to establish the charged criminal sexual conduct underlying the offense of lewd act upon a child.

## CONCLUSION

Based on the foregoing, we find B.C.'s testimony regarding the four incidents of sexual abuse inflicted by Clasby prior to the indicted offenses constitutes the archetypal "common scheme or plan" evidence. Therefore, we affirm Clasby's conviction and sentence for lewd act upon a child.

**AFFIRMED.**

TOAL, C.J., WALLER, PLEICONES and KITTREDGE, JJ., concur.

tween the uncharged act and the charged offense. *Id.* at 332–33, 580 S.E.2d at 193.

We conclude *Tutton* is distinguishable from the instant case. Initially, we note that its holding was called into question by the majority opinion in *Wallace* on the ground the analysis constituted an overly restrictive view of our case law. *Tutton* is also factually dissimilar from the instant case given the sexual battery in the charged offense and the uncharged act was not of the same type. In contrast, the type of sexual misconduct of the charged offenses and the uncharged offenses were similar in the instant case. Furthermore, unlike the single uncharged incident relied on in *Tutton*, the solicitor in the instant case presented B.C.'s testimony which detailed four prior incidents which occurred over a relatively short period of time.