748 S.E.2d 236

**The STATE, Respondent,**

**v.**

**Darren SCOTT, Appellant.**

**Appellate Case No. 2011–190428.**
**No. 5164.**

Court of Appeals of South Carolina.

Heard May 15, 2013.
Decided Aug. 14, 2013.
Rehearing Denied Sept. 20, 2013.

490

Chief Appellate Defender Robert Michael Dudek and Appellate Defender David Alexander, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Mark Reynolds Farthing, both of Columbia, for Respondent.

GEATHERS, J.

Darren Gerome Scott (Appellant) appeals his convictions of three counts of a lewd act upon a child and one count of second degree criminal sexual conduct with a minor. Appellant argues the trial court improperly admitted evidence of prior abuse allegations (bad act evidence) against Appellant to show the existence of a common scheme or plan. Specifically, Appellant argues the proffered testimony was: (1) not sufficiently similar to the crimes charged; and (2) too remote and, thus, the probative value was substantially outweighed by the danger of unfair prejudice. We disagree and affirm.

## FACTS/PROCEDURAL HISTORY

This case involved four victims (Victims), as well as two witnesses (404(b) Witnesses [1]) who testified to prior bad acts of Appellant. The trial court, finding each 404(b) Witness's testimony was sufficiently similar to the crimes charged and that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice, admitted the evidence to prove the existence of a common scheme or plan. Because Appellant now challenges the admission of the 404(b) Witnesses' testimony, as their testimony related to the alleged abuse of *each* of the *four* victims, a somewhat extended factual review is essential to a fair appraisal of Appellant's challenge.

Three sisters (then-nineteen-year-old Victim 1, seventeen-year-old Victim 2, and sixteen-year-old Victim 3) participated in a youth dance team at a church in Greenville, South Carolina. At the team's weekly meetings, the group's members danced, listened to worship music, and prayed. The center's art director also regularly talked to the dancers about issues pertinent to adolescent social development. At the November 24, 2008 meeting, the art director spoke about appropriate social media usage; this discourse prompted a male dancer to share with the team that he was a victim of sexual abuse.

Although the boy's disclosure did not pertain to Appellant in any way, Victim 1, Victim 2, and Victim 3 reacted to the boy's disclosure with "an explosion of tears, sobbing, [and] wheez-

---

1. Rule 404(b), SCRE.

ing." It was then "very obvious [to the art director] that something else was going on, and that it needed to be addressed immediately." The art director privately encouraged the sisters to talk to someone they trusted.

As the three sisters drove home,[2] they discussed the necessity of coming forward about previously experiencing their biological father's (Appellant's) sexually-abusive conduct, in view of the fact that their eight-year-old half-sister (Victim 4) was living with Appellant.[3] Shortly thereafter, Victim 1 contacted the art director and disclosed to her the long-term sexual abuse the sisters experienced. The art director alerted the church's risk management department, which contacted the county's sheriff and department of social services. The ensuing investigations resulted in the State's indictment of Appellant for three counts of lewd act upon a minor (Victims 1, 3, and 4), one count of second-degree criminal sexual conduct with a minor (Victim 2), and two counts of first-degree criminal sexual conduct with a minor (Victims 2 and 4).

At the trial's outset, the State moved to admit the testimony of the two 404(b) Witnesses. These witnesses claimed that Appellant sexually abused them in 1987, when the witnesses were approximately eight years old. Thus, the alleged prior bad acts occurred approximately eleven years before Appellant allegedly first abused then-eight-year-old Victim 1.[4]

---

2. Victim 1, Victim 2, and Victim 3 did not live with Appellant when Appellant allegedly abused them. These three Victims lived with their mother, Beverlyn, who had previously divorced Appellant; however, they often spent weekends with Appellant at his residence.

3. While Victim 4 was Appellant's biological child, she did not share a biological mother with Victims 1, 2, and 3. When Victim 4's mother was incarcerated in 2002, Victim 4 moved in with Appellant and Appellant's then-girlfriend. Although the mother of Victim 4 reacquired physical custody in 2004, after completing her prison sentence, Victim 4 subsequently returned to Appellant's home.

4. Each 404(b) Witness alleged that Appellant abused her in 1987. Thus, an eleven to twenty year time period exists between the bad acts (1987) and the charged crimes (1998–2007/2008). While there were no allegations of any abuse occurring in the decade following the 404(b) Witnesses' 1988 disclosure, the alleged resumption of sexual abuse directly correlates with Appellant's oldest daughter reaching the age of eight (the same age as the 404(b) Witnesses when Appellant allegedly abused them).

The State argued this testimony: (1) was relevant; (2) demonstrated that Appellant abused the witnesses in "ways that are strikingly similar to the [crimes charged]," and that such similarities outweighed the dissimilarities; and (3) the probative value was not substantially outweighed by the danger of unfair prejudice. Appellant objected, primarily referencing the temporal remoteness of the prior allegations of abuse to the charged crimes.[5]

After reviewing the State's related brief, the trial judge stated he would allow the 404(b) Witnesses to testify, but only after the Victims testified, thus allowing another opportunity to ensure the bad act testimony would demonstrate substantial similarity to the Victims' given testimony. The trial judge then found the testimony would be relevant and proceeded to address the evidence's similarity to the charged crimes, citing the Solicitor's argument that "some nine different elements" of similarity existed:

> From what's been set forth as proposed testimony, I think there's a great similarity between the instances to show that there would be a common scheme or plan . . . , I think by a clear and convincing standard . . . there is sufficient proof. . . . I think that the similarity is, certainly, close enough there as far as the absence of other Defendants, the location, the ages, the developmental stages of the victims throughout each of these alleged incidents . . . [and] that [Appellant] would be in a position of authority. . . . I think the probative value is stronger and the evidence should be allowed to show . . . a common scheme. . . .

The trial judge agreed to reexamine this pre-trial ruling immediately prior to the 404(b) Witnesses offering their testimony.

Thereafter, the trial commenced and all four Victims testified about the nature and circumstances of the sexual abuse they collectively endured.[6] Victim 1, who was twenty-one

---

5. Each Victim's allegations related to conduct occurring as follows: Victim 1, 1998–2002; Victim 2, 1999–2004; Victim 3, 2006; and Victim 4, 2004–2007.

6. The testimony of Victims 1, 2, and 3 was not limited to abuse that each child personally experienced; each of these Victims also testified about how Appellant abused her sister(s).

years old at the time of trial, testified that Appellant: sexually abused her every time she spent the night with him, while under his supervision at his apartment or at Appellant's sister's (her aunt's) home; began abusing her when she was around eight years old; inappropriately touched the Victims every time they spent the night with him; insisted upon bathing all of the Victims, despite the fact that each one was capable of bathing herself; consistently rubbed lotion on each Victim after bathing them, concentrating on each one's buttocks and genital areas; put each Victim to bed one at a time, whereby Appellant would lay on each Victim's bed, place that child on top of him, and would then bounce that child up and down with his hips;[7] played hide and seek with all of the Victims, whereby the children would hide and upon Appellant finding specifically, Victim 2, he would place his face on her genitals while the other Victims remained hidden;[8] and laughed when a child would see him inappropriately touching another child.

Victim 2, who was nineteen years old at the time of trial, also testified about the nature and circumstances of the alleged abuse. She testified that Appellant: sexually abused her every time she spent the night with him, while under his supervision at his apartment or at Appellant's sister's house; began sexually abusing her when she was around nine years old; would tell her how to get in the tub and begin washing her, despite Victim 2 asserting, "No, I can wash myself;" "would start rubbing lotion on [her genitals and buttocks];" would watch the children shower;[9] removed her clothing while she was sleeping; placed his hands inside her pants while she watched television and would rub her skin; and stopped abusing her when she was around fifteen years old.

---

7. The Victims consistently referred to this conduct as "hunching."

8. Victim 1 testified that in one instance of the "game," Appellant placed his face on the genitals of Victim 2, while the other Victims remained hidden. Victim 3 also testified that this incident occurred.

9. According to Victim 2, Appellant also abused Victim 4 at bath time. Victim 2 testified that while she was showering, Victim 4 pulled back the curtain and stared at her, just like Appellant did. When Victim 2 demanded, "Where did you get that from?," Victim 4 responded, "Daddy, he would look at me and touch me while I was in the shower. . . ." The testimony of Victim 3 corroborated this event.

Victim 3 was sixteen years old at the time of the trial and testified that Appellant: sexually abused her frequently while she was under his supervision at his apartment or at Appellant's sister's house; began sexually abusing her when she was around eight years old; would wash her, even though Victim 3 "knew [she] could do it by [her]self" and would tell Appellant she didn't need his help; "would rub [lotion] all over [their] bodies;" would rub his fingers inside and outside of her underwear; would play hide and seek with the Victims, whereby all Victims would hide and, upon Appellant finding specifically, Victim 2, Appellant would place his face on the genitals of Victim 2 while the other children remained hidden; would place a Victim on his hips, and "make [her] go up and down;" made her touch his genitals and would "laugh" when she resisted; would "laugh" after an incident of abuse; stopped abusing her when she was around fourteen years-old.

Victim 4, who was ten years old at the time of trial, testified that Appellant: sexually abused her at his apartment; inappropriately touched her prior to bedtime; and would often inappropriately touch her while she watched television.

After all four Victims testified, the prosecution again moved to present the 404(b) Witnesses. After recognizing Appellant's renewed and continuing objection, the trial judge allowed both 404(b) Witnesses to testify.

April, who was one of the 404(b) Witnesses, was thirty years old at the time of trial. She testified that in the late 1980s, she often spent the night with her older, then-nineteen-year-old cousin, Beverlyn, who was Appellant's then-live-in girlfriend and, in due course, the mother of Victims 1, 2, and 3. April attested that during her visits Appellant: would dry her off when she got out of the shower, "tak[ing] his time when he got to [her genitals]," despite her ability to dry herself; rubbed lotion on her entire body; played hide and seek with her, whereby she was often separated for long periods of time alone with Appellant; and crawled into bed with her, placed his hand beneath her underwear, and rubbed her genitals. April testified this abuse occurred when she was around seven or eight years old.

The other 404(b) Witness was thirty-year-old Deidra, a cousin of April. Deidra testified that when she was approxi-

mately seven or eight years old, she often accompanied April to the home of Beverlyn and Appellant. Deidra testified that during one overnight visit, Appellant: touched her breasts and genitals while she watched television; "laughed" after inappropriately touching her breasts and genitals, as if the contact was by accident; and laid back, placed her on top of his crotch, and proceeded to move her up and down.

The jury ultimately convicted Appellant of three counts of a lewd act upon a child (Victims 1, 3, and 4) and one count of second degree criminal sexual conduct with a minor (Victim 2). These convictions resulted in consecutive prison sentences of 90 months, 90 months, 90 months, and 110 months, respectively.

## ISSUES ON APPEAL

Did the trial court err in allowing the 404(b) Witnesses to testify because this evidence: (I) was not sufficiently similar to the crimes charged; and (II) was too temporally remote and its probative value was substantially outweighed by the danger of unfair prejudice?

## STANDARD OF REVIEW

In reviewing a trial court's ruling on the admissibility of evidence, appellate courts recognize that the trial judge has considerable latitude in this regard and will not disturb such rulings absent a prejudicial abuse of discretion. *State v. Whitner*, 399 S.C. 547, 557, 732 S.E.2d 861, 866 (2012); *State v. Clasby*, 385 S.C. 148, 154, 682 S.E.2d 892, 895 (2009). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *Whitner*, 399 S.C. at 557, 732 S.E.2d at 866 (citation omitted).

## LAW/ANALYSIS

In order to admit evidence of bad acts not resulting in conviction, the trial court must, "[a]s a threshold matter, . . . determine whether the proffered evidence is relevant." *Clasby*, 385 S.C. at 154, 682 S.E.2d at 895; *see State v. Wallace*, 384 S.C. 428, 433, 683 S.E.2d 275, 277 (2009). "If the trial

judge finds the evidence to be relevant, the judge must then determine whether the bad act evidence [is admissible under the terms] of Rule 404(b)" to show, *inter alia,* the existence of a common scheme or plan. *Clasby,* 385 S.C. at 154, 682 S.E.2d at 895. If the testimony is relevant and proffered for a permissible purpose, the trial court must next conduct a balancing test, pursuant to Rule 403; where the testimony's probative value is substantially outweighed by the danger of unfair prejudice, the trial court may exclude it. *See State v. Gillian,* 373 S.C. 601, 611, 646 S.E.2d 872, 877 (2007); *see also* Rule 403, SCRE ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . .").

After full consideration of this jurisprudence, we find the trial court did not abuse its discretion in admitting the testimony of both 404(b) Witnesses. This evidence (I) demonstrated a common scheme or plan and (II) its probative value was not substantially outweighed by the danger of unfair prejudice.[10]

### I. A Common Scheme Or Plan Existed.

 Although evidence of other crimes, wrongs, or acts is inadmissible to prove bad character and, in turn, action in conformity therewith, such evidence may be admissible to show a common scheme or plan. Rule 404(b), SCRE; *State v. Taylor,* 399 S.C. 51, 59, 731 S.E.2d 596, 600–01 (Ct.App.2012). In order for bad act evidence to be admissible for this limited purpose, the trial court must find that the evidence (A) is clear and convincing and (B) bears a close degree of similarity to the crimes charged. *Clasby,* 385 S.C. at 155, 682 S.E.2d at 895–96.

#### A. *The Bad Act Evidence Was Clear and Convincing.*

 " 'If the defendant was not convicted of the prior crime, evidence of the prior bad act must be clear and convincing.' " *Id.* at 155, 682 S.E.2d at 895 (quoting *State v. Gaines,* 380 S.C. 23, 29, 667 S.E.2d 728, 731 (2008)). In reviewing whether evidence of other bad acts is clear and

---

**10.** Appellant never argued the bad act testimony was not relevant.

convincing, an appellate court is bound by the trial judge's factual findings unless they are clearly erroneous. *Id.*

When the State first moved to admit the bad act evidence in the instant matter, the trial judge specifically found, "by the clear and convincing standard that [he] was required to [apply]—there is sufficient proof." The trial judge based this pre-trial determination upon the positions stated by counsel during a related hearing and within submitted written motions and a brief. Furthermore, the actual proffered 404(b) testimony was very specific and appeared credible. In light of this support within the record and the deference afforded to a trial judge's findings in this regard, the trial judge did not err in finding the bad act evidence was clear and convincing. *Id.* (holding a trial judge's finding that evidence of other bad acts is clear and convincing is binding, unless clearly erroneous).

### B. *A "Close Degree Of Similarity" Existed Between the Crimes Charged and the Bad Acts.*

While Appellant's brief argues that the bad act evidence was "not sufficiently similar" under Rule 404(b) and, therefore, should have been excluded, Appellant did not directly raise this argument at trial. After jury qualification, but immediately prior to opening arguments, the Solicitor moved to admit the bad act testimony, arguing this testimony was relevant, clear and convincing, sufficiently similar, and that its probative value was not substantially outweighed by the danger of unfair prejudice. The trial judge agreed with each of the Solicitor's contentions and even noted that the bad act evidence was "great[ly] similar[ ]." Appellant's attorney immediately took exception:

> [*N* ]*otwithstanding any similarities*, [the alleged bad acts] go back to 1987. . . . [M]y position is that because of the— *remoteness is the main thing* . . . . [T]he prejudicial effect of allowing evidence as a whole would substantially outweigh its probative value and *would be unfair to the Defendant and highly prejudicial.* (emphases added)

Thus, it appears Appellant did not base this objection on a lack of similarity; rather, Appellant argued temporal remoteness rendered the evidence excludable pursuant to Rule 403. Moreover, when the trial judge again considered the issue

immediately prior to the 404(b) Witnesses taking the stand, the trial judge again asked if Appellant had any objection. Appellant responded, "[n]othing, other than [the earlier] objection continues." Therefore, it is questionable whether Appellant preserved his argument that the bad act evidence was not sufficiently similar to the crimes charged. *See State v. Johnson*, 363 S.C. 53, 58, 609 S.E.2d 520, 523 (2005) (stating an objection should be sufficiently specific to bring the exact error to the trial court's attention). Nonetheless, we address the merits of Appellant's argument. *See Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 330, 730 S.E.2d 282, 285 (2012) (stating it is "good practice ... to reach the merits of an issue when error preservation is doubtful").

Despite Appellant's contention to the contrary, the bad act evidence bore the requisite degree of similarity. Evidence of other crimes or wrongs is admissible to show a common scheme or plan when such evidence has a "close degree of similarity" to the crimes charged. *Wallace*, 384 S.C. at 433–34, 683 S.E.2d at 278; *see* Rule 404(b), SCRE (allowing evidence of a bad act to demonstrate a common scheme or plan). A close degree of similarity exists when the "similarities outweigh the dissimilarities." *Wallace*, 384 S.C. at 433, 683 S.E.2d at 278. In conducting this similarity review, a trial court "should consider all relevant factors." *Taylor*, 399 S.C. at 59, 731 S.E.2d at 601 (citing *Wallace*, 384 S.C. at 433–34, 683 S.E.2d at 278). Additionally, in the context of a sexual abuse case, the following factors are pertinent: (1) the age of the victims at the time of abuse; (2) the relationship between the victims and the perpetrator; (3) the location where the abuse occurred; (4) the use of coercion or threats; and (5) the manner of the occurrence. *Wallace*, 384 S.C. at 433–34, 683 S.E.2d at 278; *Taylor*, 399 S.C. at 59–60, 731 S.E.2d at 601. When a review of all pertinent factors establishes a "close degree of similarity," no further analysis is necessary; the evidence is admissible. *Wallace*, 384 S.C. at 434, 683 S.E.2d at 278. Finally, in making this similarity determination, focus is upon whether each particular proffer of bad act evidence is sufficiently similar to the crimes charged, not whether multiple proffers are sufficiently similar to each other. *See id.* at 433–34, 683 S.E.2d at 278 (holding bad act evidence must be sufficiently similar to the crimes charged).

We now apply these principles to determine whether the testimony of each 404(b) Witness was sufficiently similar to the crimes charged, such that the evidence was admissible as evidence of a common scheme or plan. As to 404(b) Witness April, the following similarities existed between her testimony and the crimes charged:

- The child was approximately eight years old when first abused;
- Abuse occurred when the child was under Appellant's physical custody and control and when Appellant was the only adult present;
- Abuse occurred when the child spent the night at Appellant's residence while visiting a relative;
- Abuse occurred at bath time; Appellant *insisted* upon washing the child, despite the child being able to do this alone; Appellant focused upon washing child's genitals; Appellant rubbed lotion over child's entire body after bath time;
- Abuse occurred while Appellant played "hide and seek" with the children; whereby one child was separated for an extended period;
- Abuse occurred when Appellant climbed into bed with the child and placed his hands in the child's panties and rubbed her genitals.

In contrast to the many similarities, only a couple of dissimilarities existed. Such dissimilarities include the facts that April was, unlike the Victims, not blood-related to Appellant; that Appellant did not place April on his lap and thrust her up and down, like he did with the Victims; and that April alleged a single incident of abuse. Although we recognize that these points of distinction do exist, we find the trial court did not abuse its discretion in determining these distinctions were insufficient to outweigh the many other similarities.

First, although April was not blood-related to Appellant, April was related to Appellant's then-live-in-girlfriend, Beverlyn. This effectively afforded Appellant an opportunity to abuse that was nearly identical to the circumstances surrounding the Victims' allegations—a child staying overnight at Appellant's residence to visit with a relative. Thus, any

distinction based upon the reason for the abused child's visit, whether to spend time with Appellant, as in the Victims' cases, or to visit a cousin (Beverlyn), as in April's situation, lacks merit. Second, although April did not allege that Appellant abused her in each of the ways in which Victims were allegedly abused by Appellant, the *vast majority* of April's specific allegations directly align with those of the Victims: abuse occurred at bath time, along with the inappropriate application of lotion; abuse occurred in the child's bed just prior to bedtime; the abuse included nefarious versions of "hide-and-seek;" the abuse occurred when the child was approximately eight years old; and the abuse occurred during overnight visits to a relative's home. Thus, the similarity of April's testimony to the crimes charged outweighed the dissimilarities and the evidence complied with Rule 404(b). *See Wallace*, 384 S.C. at 433, 683 S.E.2d at 278 (stating the requisite "close degree of similarity" exists when the "similarities outweigh the dissimilarities").

As to 404(b) Witness Deidra, the following similarities existed between her testimony and the crimes charged:

- The child was approximately eight years old when first abused;
- Abuse occurred when the child was under Appellant's physical custody and control and when Appellant was the only adult present;
- Abuse occurred while the child spent the night at Appellant's residence;
- Abuse occurred while the child watched television with Appellant;
- Appellant initially acted as if his improper touching was by accident;
- Appellant placed the child over his crotch and thrust the child up and down.

While the dissimilarities include the facts that Deidra was not blood-related to Appellant, that no bath time or bedtime abuse occurred, and that Appellant did not participate in a game of hide-and-seek to improperly touch Deidra, the similarities, many of which were quite peculiar, still outweigh these dissimilarities. In fact, the *vast majority* of Deidra's

specific allegations directly align with those of the Victims: the abuse occurred when spending the night at Appellant's residence while visiting with a relative; [11] abuse occurred when Appellant placed a child over his crotch and thrust her up and down; abuse occurred when Appellant inappropriately touched a child under her clothes while the child watched television; Appellant would laugh after inappropriately touching the child, as if the physical contact was accidental; and the abuse occurred when the child was approximately eight years old. Accordingly, Deidra's testimony also evinced a "close degree of similarity." *See id.* (holding a "close degree of similarity" exists when the "similarities outweigh the dissimilarities").

In summation, because the ages of both 404(b) Witnesses at the time of their alleged abuse, the locations and situations where these witnesses alleged Appellant abused them, and the nature and specific types of abuse alleged by these witnesses were profoundly similar to the Victims' allegations, the similarities outweigh the dissimilarities. Thus, the trial court did not err in finding the close degree of similarity required to admit evidence under Rule 404(b) existed.

## II. Temporal Remoteness and the 403 Balancing Test.

██ As Appellant's brief initially frames this issue on appeal, "the [trial] court erred by admitting the [404(b)] testimony [because] the alleged sexual acts were very remote." Thus, Appellant posits that due to remoteness alone, the bad act evidence was inadmissible. Appellant's brief, however, further develops this contention, arguing the probative value of the evidence was substantially outweighed by the danger of unfair prejudice because the 404(b) evidence was "too remote" in time.[12] Thus, Appellant potentially raises two temporal remoteness issues: Whether admission of bad act evidence occurring some eleven to twenty years prior to the crimes

---

11. Deidra was a cousin of April, who was a cousin of Appellant's then-live-in-girlfriend, Beverlyn. Thus, Appellant had an attenuated familial tie to Deidra.

12. Appellant argues, "[due to extreme remoteness,] even if ... sufficient similarities [exist,] if ever there was a case where the evidence should have been excluded because its probative value was substantially outweighed by its unduly prejudicial effect, it was in this case."

charged (A) is an independent basis for error; and (B) consti-
tuted error because the temporal remoteness diminished the
evidence's probative value, such that it was substantially out-
weighed by the danger of unfair prejudice.

A. *Temporal Remoteness Is Not Dispositive.*

As to the first argument, a trial court does not necessarily
err when it admits testimony about a bad act occurring many
years before the crimes charged. *See State v. Tutton,* 354
S.C. 319, 332, n. 5, 580 S.E.2d 186, 193 n. 5 (Ct.App.2003)
("Remoteness in time, however, is not dispositive."); *State v.
Blanton,* 316 S.C. 31, 33, 446 S.E.2d 438, 440 (Ct.App.1994)
("That the alleged acts perpetrated against the two witnesses
occurred some seven to eight years prior to the alleged
molestation of [the victim], is not alone dispositive."). In fact,
evidence of bad acts occurring many years before the charged
crime is often admissible to demonstrate a common scheme or
plan. *See State v. Hallman,* 298 S.C. 172, 174–75, 379 S.E.2d
115, 116–17 (1989) (holding the trial court properly admitted
evidence of a bad act that occurred seven years prior to the
charged crime); *Blanton,* 316 S.C. at 33, 446 S.E.2d at 440
(holding the trial court properly admitted testimony regarding
a bad act that occurred seven to eight years before the crime
charged); *cf. State v. Hubner,* 362 S.C. 572, 584–87, 608
S.E.2d 463, 469–70 (Ct.App.2005) (finding prior bad act evi-
dence occurring some fourteen years prior to the crime
charged was improperly admitted because the evidence's pro-
bative value did not outweigh the evidence's prejudicial effect),
*rev'd,* 384 S.C. 436, 437, 683 S.E.2d 279, 280 (2009) (reversing
the court of appeals, in light of *Wallace,* 384 S.C. 428, 683
S.E.2d 275). In view of these cases and the language of Rule
404(b), courts have considered temporal remoteness in deter-
mining whether admission is proper, but there exists no set
time limit beyond which a prior bad act is simply, *per se,* too
remote. *Compare* Rule 404(b), SCRE (allowing "[e]vidence of
other crimes, wrongs, or acts" to show "the existence of a
common scheme or plan," without imposing any temporal
restrictions), *with* Rule 609(a) and (b), SCRE (generally pro-
hibiting the admission of prior convictions to attack witness
credibility if more than ten years elapsed since the date of
conviction or release from confinement). Thus, the trial court

did not err in admitting the bad act evidence, simply because the evidence was purportedly too temporally remote.

Nonetheless, Appellant cites *State v. Fonseca* for the proposition that even a two-year gap between a prior bad act and the crime charged could render the evidence of the prior bad act inadmissible, because it was simply too "remote." 383 S.C. 640, 649, 681 S.E.2d 1, 5 (Ct.App.2009) ("The State provides no compelling argument of any similarities between the two occurrences, or any argument to overcome the fact that the incidents are remote in time." (footnote omitted)); *see State v. Fonseca*, 393 S.C. 229, 229, 711 S.E.2d 906, 906 (2011) ("Finding no error in the Court of Appeals' [*Fonseca*] decision, we adopt it as our own and therefore AFFIRM."). Although the *Fonseca* opinion, as adopted by our supreme court, incorporated the phrase "remote in time" within its analysis, the ultimate determination that the trial court erred in admitting the evidence was based upon the bad act evidence's dissimilarity to the crime charged. In *Fonseca*, two separate incidents of abuse were alleged by a single victim against a single perpetrator; a two-year gap existed between the first incident (the bad act) and the second incident (the crime charged). *Fonseca*, 383 S.C. at 643–45, 681 S.E.2d at 2–3. Because little similarity existed between the bad act and the charged offense, and because there was no continuous, illicit conduct, the court held the State failed to show that the "remote" allegations were sufficiently similar. *Id.* at 649, 681 S.E.2d at 5. Thus, *Fonseca's* holding was based upon the lack of similarity between the two "remote" events, rather than upon the relatively short, two-year period of time between them.

B. *The Probative Value Was Not Substantially Outweighed By the Danger Of Unfair Prejudice.*

Even when bad act evidence is sufficiently similar to the crimes charged, a trial court may, nonetheless, exclude the evidence when its probative value is substantially outweighed by the danger of unfair prejudice. *See Gillian*, 373 S.C. at 611, 646 S.E.2d at 877; *see also* Rule 403, SCRE ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ..."). "Unfair prejudice means an undue tendency to suggest a decision on

an improper basis." *State v. Spears,* 403 S.C. 247, 253, 742 S.E.2d 878, 881 (Ct.App.2013) (citation omitted).

■■■ Because "the result [of this Rule 403 Balancing Test] will generally turn on the facts of each case," it "must be based on the entire record." *Clasby,* 385 S.C. at 156, 682 S.E.2d at 896. In the instant matter, remoteness is a fundamental fact at issue within the record and, therefore, remoteness is pertinent to determining total probative value. *See id.* (requiring the balancing test of Rule 403 to consider all facts within the record). Additionally, this Rule 403 analysis must reconsider the similarities and dissimilarities in determining total probative value, including a reduction in probative value predicated upon remoteness, and, in turn, whether the probative value is outweighed by the danger of unfair prejudice. *See Taylor,* 399 S.C. at 61, 731 S.E.2d at 601–02 ("We are cognizant of the prejudicial effect of admitting evidence of [bad acts] based upon the degree of similarity with the charged crime."); *id* (reconsidering the similarities to determine probative value); *id.* (weighing probative value against the danger of unfair prejudice). Therefore, even though we have already considered, pursuant to Rule 404(b), whether the similarities outweighed the dissimilarities, we must now reconsider the similarities and dissimilarities, as well as temporal remoteness and other factors, pursuant to Rule 403, to ascertain total probative value and, subsequently, to compare this total probative value to the danger of unfair prejudice. *See Clasby,* 385 S.C. at 156, 682 S.E.2d at 896 (reconsidering the entire record to ascertain probative value and, subsequently, comparing the evidence's probative value to the danger of unfair prejudice); *Taylor,* 399 S.C. at 61, 731 S.E.2d at 601–02 (reconsidering the similarities of bad act evidence to determine probative value and, subsequently, comparing this probative value to the danger of unfair prejudice); *see also* Rule 403, SCRE (requiring a court to determine probative value and to subsequently compare the evidence's probative value to the danger of unfair prejudice).

For the following three reasons, the total probative value of the bad act evidence in the instant matter was great and, as a result, not substantially outweighed by the danger of unfair prejudice. First, the similarities were not only numerous, but an extremely high level of continuity existed between both

404(b) Witnesses' testimony and between all four Victims' testimony. Second, a high level of continuity extended to even the most specific acts of abuse. Third, the trial judge's findings related to the temporal remoteness issue were specific and well-supported.

As to the first reason, the similarities between the bad act testimony and the Victims' allegations were not only numerous—at least nine similarities existed—many similarities also existed between the two 404(b) Witnesses' testimonies and between *all four* Victims' allegations. Such continuity is highly probative.

For instance, much of 404(b) Witness April's testimony coincided with the Victims' specific allegations: abuse occurred when she spent the night at Appellant's residence; abuse occurred when Appellant was the only supervising adult; abuse occurred at bath time; Appellant would dry her off after a bath, focusing on her buttocks and genitalia, despite her being self-sufficient; Appellant rubbed lotion on her entire body; Appellant played hide and seek, whereby one child was separated from the other(s) for an extended period of time; Appellant climbed into her bed and placed his hands in her panties and rubbed her genitals; and abuse first occurred when she was approximately eight years old. Because these similarities were shared between the four Victims' collective testimony and April's testimony, the evidence was highly probative.

Consistently, much of Deidra's testimony also coincided with the Victims' specific allegations: abuse occurred when she spent the night at Appellant's residence; abuse occurred when Appellant was the only supervising adult; abuse occurred while she watched television with Appellant, whereby Appellant touched child's genitals, buttocks, and breasts, both over and under child's clothes; Appellant placed her over his crotch and proceeded to move her up and down (the Victims consistently referred to this as "hunching"); and abuse occurred when she was approximately eight years old. Thus, the sheer number of similarities, as well as the high incidence of overlap between both 404(b) Witnesses' testimony and the collective Victims' testimony, carries great probative weight.

We fully acknowledge that 404(b) Witness Deidra did not experience the bath time assaults that April and the Victims suffered, that 404(b) Witness April did not experience the "hunching" that Deidra and the Victims suffered, and that these dissimilarities do somewhat diminish probative value. However, these few dissimilarities do not result in the danger of unfair prejudice substantially outweighing the immense probative value that still remains. Further, any dissimilarity between 404(b) Witness April's testimony and 404(b) Witness Deidra's testimony is not the focus of the inquiry. *See Wallace*, 384 S.C. at 433–34, 683 S.E.2d at 278 (holding bad act evidence must be sufficiently similar *to the crimes charged*). Rather, each 404(b) Witness's testimony must be sufficiently similar to the crimes related to the Victim's allegations. Here, the testimony of each 404(b) Witness was remarkably similar *to the crimes charged*, despite the fact that each 404(b) Witness's testimony was distinguishable from the other.

Regarding the second reason why the probative value was not substantially outweighed by the danger of unfair prejudice, the bad act testimony was not only similar to the Victims' allegations, it relied upon a high level of specificity that extended to even the most peculiar conduct alleged by Victims, such as the bath time assaults, followed by area-focused drying and full-body lotioning, "hunching," laughing following an incident of abuse, and a perverse version of hide-and-seek. This high level of specificity regarding very peculiar conduct further increases the already great probative weight.

As to the final reason, the trial judge's findings regarding the temporal remoteness issue were specific and well-supported. The trial judge specifically found that the "probative value is stronger and the evidence should be allowed to show . . . a common scheme" and that the witnesses appeared credible. In fact, the Victims "had never spoken to the [404(b) Witnesses] about what happened to them," and the two 404(b) Witnesses had never spoken to each other about what occurred. Thus, considering this absence of communication, the numerous similarities that existed between the bad acts and the Victims' allegations, and the trial judge's on-the-record consideration of the potential for unfair prejudice, ample support exists to negate Appellant's argument that the amount of time between the bad acts and the crimes charged diminish-

ed probative value, such that the total probative value was substantially outweighed by the existing danger of unfair prejudice.

Based upon these three conclusions, the probative value of the 404(b) Witness testimony was not substantially outweighed by the danger of unfair prejudice. Accordingly, this bad act evidence did not have an undue tendency to suggest a decision on an improper basis. Therefore, the trial court did not err in admitting this evidence.

## CONCLUSION

The trial court did not abuse its discretion in admitting evidence of Appellant's bad acts, occurring some eleven to twenty years prior to the crimes charged. The related testimony (I) was sufficiently similar to the crime charged; and (II) was neither too remote nor was the evidence's probative value substantially outweighed by the danger of unfair prejudice. Appellant's convictions are

**AFFIRMED.**

FEW, C.J. and LOCKEMY, J., concur.