803 S.E.2d 899

**The STATE, Respondent,**

v.

**Wallace Steve PERRY, Appellant.**

**Appellate Case No. 2014-002654**
**Opinion No. 5503**

Court of Appeals of South Carolina.

Heard April 11, 2017

Filed July 26, 2017

Rehearing Denied August 24, 2017

648

Kerri Brown Rupert, of Murphy & Grantland, PA, and Chief Appellate Defender Robert Michael Dudek, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Vann Henry Gunter, Jr., both of Columbia; and Solicitor William Walter Wilkins, III, of Greenville, for Respondent.

GEATHERS, J.:

Wallace Steve Perry appeals his convictions for two counts of first-degree criminal sexual conduct (CSC) and two counts of second-degree CSC. He argues the trial court erred in (1) finding his former stepdaughter's testimony was admissible as evidence of a common scheme or plan and (2) allowing a doctor to improperly comment on the veracity of his daughter's testimony. We affirm.

## FACTS/PROCEDURAL HISTORY

In 1993, Perry met and began dating Laura Jones (Mother). Perry and Mother had two sets of twins: Daughter One and Daughter Two born in 1994 and Daughter Three and Son born in 1996. After Mother and Perry separated in August 2000, they agreed Perry would have visitation with the children on weekends and holidays. In March 2012, Daughter Three re-

vealed to Mother that Perry had sexually abused her during visitation. After Daughter Three's disclosure, Daughter Two informed Mother that she had also been sexually abused by Perry.[1] Mother later contacted the Department of Social Services (DSS) to report the abuse, and DSS reported the incident to the Greenville Police Department. Perry was subsequently indicted for two counts of first-degree CSC and two counts of second-degree CSC. His trial was held in December 2014.

Before the trial began, the State proffered the testimony of Brandy Newcomer, Perry's stepdaughter from a prior marriage, regarding abuse Perry allegedly inflicted on her. The State proffered this testimony under Rule 404(b), SCRE, as evidence of a common scheme or plan. During a discussion with the trial court before the proffer, the solicitor noted that unlike with Daughter Two and Daughter Three, Perry's abuse of Newcomer "progress[ed] on into actual vaginal/penile penetration." However, the solicitor acknowledged that portion of Newcomer's account of the abuse would "not be admissible because it [went] beyond the scope of similar" and could be excluded by the court pursuant to *State v. Wallace.*[2]

During the proffer, Newcomer[3] testified her mother married Perry when Newcomer was five years old. She stated that when she was nine years old, Perry entered her room one night and digitally penetrated her vagina. According to Newcomer, Perry continued to abuse her periodically over the next four years, and she estimated he digitally penetrated her about twenty times. Newcomer testified the abuse progressed when she was thirteen or fourteen. She stated, "One incident, I had two friends over. He snuck into my bedroom. The penetration and everything started. Then he got up and left." Newcomer testified that around that time, Perry also came into the bathroom while she was taking a bath and "had to

---

1. Daughter One and Son never alleged they were abused by Perry.

2. 384 S.C. 428, 434–35, 683 S.E.2d 275, 278–79 (2009) (finding evidence that the appellant abused the victim's older sister was properly admitted under Rule 404(b), SCRE, as evidence of a common scheme or plan and permitting the trial court to redact dissimilar particulars of sexual conduct to avoid unfair prejudice).

3. Newcomer was thirty-six years old at the time of Perry's trial.

bathe [her] before [she] could go." She stated the abuse ended when she was fourteen.

Newcomer stated she did not disclose the abuse right away because Perry had told her no one would believe her and her accusations would hurt the family. Newcomer told her mother about the abuse when she was fourteen years old, and her mother divorced Perry shortly thereafter. When asked why the case did not go to trial, Newcomer stated she had told her mother she did not want to go to court because she was afraid Perry would kill her family.

According to the State, Newcomer's testimony was proper under the common scheme or plan exception of Rule 404(b) because of the similarities between Perry's abuse of Newcomer and his abuse of Daughter Two and Daughter Three. In response, Perry contended Newcomer's testimony was inadmissible propensity evidence. When the court inquired whether DSS had any records of Perry's abuse of Newcomer, the State said it had some records that indicated the allegations were investigated. However, the State noted Perry was not tried for the charges of abuse against Newcomer because, at the time, Newcomer was pregnant, she suffered from some mental health issues, and there were concerns that the defense would characterize her as sexually promiscuous. As a result, Perry completed a pretrial intervention program and did not admit any guilt. After hearing the proffer and the parties' arguments, the trial court decided to reserve its ruling on whether Newcomer would be permitted to testify.

During the trial, Daughter Three [4] testified that after Mother and Perry separated, Perry moved into a three-bedroom apartment and she shared a room and an air mattress with Daughter One and Daughter Two. According to Daughter Three, around five or six o'clock in the morning, Perry would come into the bedroom Daughter Three shared with her sisters and would get in bed with them. When asked to describe the abuse, Daughter Three recalled Perry digitally penetrating her vagina about five times but stated the abuse did not progress beyond that. According to Daughter Three, the abuse occurred when she was around ten or eleven years old.

---

4. Daughter Three was eighteen years old at the time of the trial.

After the abuse ended, Daughter Three continued visiting Perry on the weekends until she disclosed the abuse when she was around sixteen years old. Daughter Three explained that she waited to tell Mother what was going on because Perry had told her "that if we told anybody, we would be the ones who got in trouble and [would] get taken away from my mom." Daughter Three stated she initially disclosed the abuse to her youth group leader, who encouraged her to tell Mother.

Daughter Two[5] subsequently testified. She stated Perry first molested her when she was between five and seven years old.[6] When asked about the first time Perry abused her, Daughter Two stated she was lying on Perry's bed watching television when he entered the room, lay down next to her, and digitally penetrated her vagina. According to Daughter Two, Perry stated that if she told anyone about what had happened, she "would get in just as much trouble as he would" and would be taken away from Mother. Daughter Two testified that after the first incident, Perry began molesting her almost every weekend during visitation. She stated that around five or six a.m. on Saturday and Sunday mornings, Perry would get in the bed Daughter Two shared with her sisters or lie on the floor next to the bed and digitally penetrate her. Daughter Two testified she never tried to wake up her sisters because she was scared they would tell Mother.

Daughter Two recalled Perry moved into a two-bedroom apartment in 2007, where she shared a room and a bed with Daughter Three, Perry shared a room with Son, and Daughter One slept on the couch. Daughter Two testified Perry continued digitally penetrating her in the early morning hours at the new apartment; however, the abuse also progressed to oral sex on two occasions. According to Daughter Two, Perry

5. Daughter Two was twenty years old at the time of the trial.

6. Daughter Two initially testified Perry began molesting her when she was seven years old. However, on cross-examination, Perry's counsel asked Daughter Two whether she "testified earlier that [she was] accusing [Perry] of starting to touch [her] inappropriately at age [five]." Daughter Two replied, "Yes, ma'am. I think there is some kind of blockage there from the ages of [five] to [seven]. I tried to block it out for so long. I can't really remember." She later admitted she was not sure of the age and stated she remembered Perry first sexually abusing her when she was seven years old.

orally penetrated her vagina late one night while she was sitting in a chair and early one morning while she was in bed with Daughter Three. Daughter Two stated the abuse ended when she was fifteen years old, and she disclosed the abuse to Mother after Daughter Three's disclosure.

Before beginning the second day of trial, the trial court informed the parties that after considering Newcomer's proffer, it was inclined to allow her to testify. Perry again objected, arguing Newcomer's testimony was prejudicial and would confuse the jury. He further argued Newcomer's testimony was inadmissible to show a common scheme or plan because it was not similar enough to Daughter Two's and Daughter Three's testimony. Additionally, Perry argued he could not determine whether Newcomer had changed her story about the abuse because the records from the solicitor's office relating to the previous charges against him had been destroyed. The trial court subsequently found there was clear and convincing evidence that the prior bad act had occurred and Newcomer's testimony was probative and admissible under the 404(b) exception.

Newcomer's testimony before the jury was substantially similar to her proffered testimony, including that (1) the abuse began when she was nine years old and ended when she was fourteen; (2) Perry was her stepfather at the time of the abuse; (3) the abuse typically occurred in her bedroom, except for one incident when she was fourteen when Perry bathed her; (4) Perry told her that if she disclosed the abuse, no one would believe her and her accusations would hurt the family; and (5) the abuse typically consisted of digital penetration. However, Newcomer added that the abuse had progressed to oral sex one time, which she failed to specifically discuss in her proffer. She also estimated Perry had digitally penetrated her five times, rather than the estimate of twenty she made during the proffer.

The State also called Dr. Nancy Henderson, a pediatrician for Greenville Health System, to testify. After being qualified as an expert in the field of pediatric medicine and child sexual assault examinations, Dr. Henderson testified about examining Daughter Two and Daughter Three after they disclosed the sexual abuse. Dr. Henderson stated that before the examina-

tions, she spoke to Daughter Two and Daughter Three about what had occurred.

During her discussion of her examination of Daughter Three, Dr. Henderson testified the results were normal and noted "[i]t would have been very unlikely ... to find anything on the exam" because of the delayed disclosure. Dr. Henderson was subsequently asked whether her findings were consistent with Daughter Three having experienced sexual abuse. She responded, "Yes." Perry objected, arguing Dr. Henderson was improperly vouching for Daughter Three. The trial court noted the issue was "close"; however, it ultimately overruled the objection, stating Dr. Henderson had merely "testified that [her] findings were consistent."

After the State rested, Perry took the stand and denied molesting Daughter Two and Daughter Three. At the conclusion of the trial, the jury found Perry guilty of all charges. The trial court sentenced Perry to concurrent sentences of thirty years' imprisonment for each conviction of first-degree CSC and twenty years' imprisonment for each conviction of second-degree CSC. This appeal followed.

## ISSUES ON APPEAL

I. Did the trial court err in finding Newcomer's testimony was admissible as evidence of a common scheme or plan?

II. Did the trial court err in finding Dr. Henderson did not improperly comment on the veracity of Daughter Three's testimony?

## STANDARD OF REVIEW

In criminal cases, an appellate court may review only errors of law. *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). "The admission or exclusion of evidence is left to the sound discretion of the trial [court]," and the court's "decision will not be reversed on appeal absent an abuse of discretion." *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001). An abuse of discretion occurs when the decision of the trial court is controlled by an error of law or lacks

evidentiary support. *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006).

## LAW/ANALYSIS

### I. Newcomer's Testimony

Perry argues the trial court erred in finding Newcomer's testimony admissible as evidence of a common scheme or plan. He further contends the trial court erred in finding Newcomer's testimony more probative than prejudicial under Rule 403, SCRE. We disagree.

To admit evidence of prior bad acts, the trial court must first determine whether the proffered evidence is relevant.[7] *State v. Clasby*, 385 S.C. 148, 154, 682 S.E.2d 892, 895 (2009). If the trial court finds the evidence relevant, the court must then determine whether the bad act evidence is admissible under Rule 404(b) to show, *inter alia*, the existence of a common scheme or plan. *Id.* Even if the testimony is relevant and admissible under Rule 404(b), the trial court must apply Rule 403 and exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *Id.* at 155–56, 682 S.E.2d at 896.

### A. Rule 404(b), SCRE

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b), SCRE. "It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent." *Id.* For evidence of a prior bad act to be admissible to show the existence of a common scheme or plan, the trial court must find the evidence (1) is clear and convincing and (2) bears a close degree of similarity to the crimes charged. *Clasby*, 385 S.C. at 155, 682 S.E.2d at 895–96.

---

7. Perry did not challenge the relevance of Newcomer's testimony during his trial or on appeal. Therefore, we have not addressed this issue. *See State v. Scott*, 405 S.C. 489, 498 n.10, 748 S.E.2d 236, 241 n.10 (Ct. App. 2013) (declining to address the issue because the appellant "never argued the bad act testimony was not relevant").

### i. Clear and Convincing Evidence

█ Perry contends there are "clear issues with whether the prior bad act occurred." He points to the fact that there was no trial and the solicitor's office did not have any records for the charges related to Newcomer's allegations.

 "If the defendant was not convicted of the prior crime, evidence of the prior bad act must be clear and convincing." *State v. Gaines*, 380 S.C. 23, 29, 667 S.E.2d 728, 731 (2008). "[W]e do not review a trial [court's] ruling on the admissibility of other bad acts by determining *de novo* whether the evidence rises to the level of clear and convincing." *State v. Wilson*, 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001). "If there is any evidence to support the admission of the bad act evidence, the trial [court's] ruling will not be disturbed on appeal." *Id.*; *see also Wallace*, 384 S.C. at 432 n.2, 683 S.E.2d at 277 n.2 ("Bad act evidence that is not subject to a conviction must be shown by clear and convincing evidence and is reviewed under an 'any evidence' standard on appeal.").

In *Wilson*, our supreme court applied the any evidence standard of review and found a witness's testimony that she saw the defendant give a woman a plastic bag containing a white rock substance in exchange for twenty dollars was admissible evidence of a prior bad act. 345 S.C. at 6–7, 545 S.E.2d at 829–30. Focusing on the contents of the witness's testimony, our supreme court found the testimony amounted to "evidence of a prior drug transaction" and determined the issue of the witness's credibility was for the jury's consideration. *Id.*

Here, the trial court found there was clear and convincing evidence that the prior bad act had occurred. During the proffer, Newcomer provided a detailed description of the abuse, including where and when the abuse occurred and specific details of the sexual battery. As in *Wilson*, Newcomer's testimony was sufficient to provide evidence of the prior bad act and her credibility was an issue for the jury's consideration. *See id.* Thus, there is evidence to support the trial court's ruling.

### ii. Close Degree of Similarity

Perry argues the trial court erred in finding Newcomer's testimony was admissible under Rule 404(b), SCRE, because there was not a close degree of similarity between the alleged abuse of Newcomer and the alleged abuse of Daughter Two and Daughter Three. We disagree.

If the trial court concludes there is clear and convincing evidence that the defendant committed the prior bad act, the court must determine whether the prior bad act falls within the common scheme or plan exception. *Clasby*, 385 S.C. at 155, 682 S.E.2d at 896. "When determining whether evidence is admissible as [part of a] common scheme or plan, the trial court must analyze the similarities and dissimilarities between the crime charged and the bad act evidence to determine whether there is a close degree of similarity." *Wallace*, 384 S.C. at 433, 683 S.E.2d at 277–78. "When the similarities outweigh the dissimilarities, the bad act evidence is admissible under Rule 404(b)." *Id.* at 433, 683 S.E.2d at 278.

In cases involving sexual abuse, the trial court should consider the following non-exhaustive list of factors when determining whether there is a close degree of similarity between the prior bad act and the charged crime: "(1) the age of the victims when the abuse occurred; (2) the relationship between the victims and the perpetrator; (3) the location where the abuse occurred; (4) the use of coercion or threats; and (5) the manner of the occurrence, for example, the type of sexual battery." *Id.* at 433–34, 683 S.E.2d at 278.

Our supreme court applied the above factors in *Wallace* and found that because of the close degree of similarity between the abuse suffered by both the victim of the charged offense and her sister, the sister's testimony about the prior bad act was admissible under Rule 404(b). *Id.* at 434, 683 S.E.2d at 278. Specifically, the court noted the similarities included the defendant's "relationship to the victims (his stepdaughters), abuse beginning at about the same age, abuse occurring in the family home when the mother was absent, and an admonishment not to tell because no one would believe it." *Id.*

The *Wallace* court noted there was a difference in the type of sexual battery inflicted on the victim and her sister. *Id.* The

victim testified the defendant had touched her breasts and had digitally penetrated her before she reported the abuse. *Id.* at 431, 683 S.E.2d at 276–77. However, the sister testified during an in camera hearing that digital penetration and oral sex eventually progressed to sexual intercourse. *Id.* at 434, 683 S.E.2d at 278. The trial court determined that to avoid unfair prejudice to the defendant, any testimony regarding sexual intercourse would not be allowed when the sister testified before the jury. *Id.* Our supreme court agreed with the trial court's decision to redact a portion of the sister's testimony and found it did not make the two acts seem more similar than they actually were. *Id.* Rather, our supreme court noted the trial court had "redacted only the last step in a progressive course of abuse" and "[t]he fact that [the victim's] abuse was interrupted before it could culminate in intercourse [did] not diminish the similarity between the progression the abuse took in each case." *Id.* at 435, 683 S.E.2d at 278. Our supreme court also approved of trial courts redacting "dissimilar particulars of sexual conduct to avoid unfair prejudice to the defendant." *Id.*

In the instant case, there was a close degree of similarity between the testimony of Newcomer and that of Daughter Two and Daughter Three. Applying the *Wallace* factors to Perry's abuse of all three victims, we find the following similarities: (1) the abuse primarily occurred during the victims' preteen and early teenage years; (2) Perry had a parent-child relationship with the victims; (3) the abuse always occurred at Perry's house and typically occurred in the victims' bedrooms while they were sleeping; (4) Perry used threats to prevent the victims from disclosing the abuse; and (5) the abuse primarily involved digital penetration.

Perry contends there are several dissimilarities between the charged crimes and the prior bad act. In terms of his first argument regarding the victims' ages, we acknowledge the victims' abuse did not occur for an identical length of time or at the exact same ages: (1) Newcomer stated she was abused between the ages of nine and fourteen; (2) Daughter Three testified she was ten or eleven years old when Perry abused her; and (3) Daughter Two stated the abuse began when she was between five and seven years old and ended when she was

fifteen years old.[8] There was a discrepancy regarding when Daughter Two was first abused—Daughter Two stated the abuse could have begun when she was five years old but explained that she remembered Perry first sexually abusing her when she was seven years old. Regardless of whether the abuse began when Daughter Two was five or seven, her abuse began at an earlier age than the abuse of Newcomer and Daughter Three. However, we find this factor still amounts to a similarity in light of the fact that the abuse of all three victims primarily occurred during the victims' preteen and early teenage years.

Perry also asserts (1) the abuse allegedly occurred at different locations and times and (2) the content of the threats he allegedly made was different. All of the abuse took place at Perry's then-current home and primarily occurred in the victims' bedrooms. The abuse also occurred at night or early in the morning[9] when the victims were in bed. In terms of threats, we note that Newcomer testified Perry told her that no one would believe her and that her accusations would hurt the family, while the threats to Daughter Two and Daughter Three focused on the fact that they would get into trouble and would be taken away from Mother. These threats all share a common thread—potential harm to the family unit. Furthermore, although the threats were not identical, the wording is less important than the fact that all of the threats were made in an attempt to prevent the victims from disclosing the abuse.

Finally, Perry points to the fact that Newcomer and the State "indicated the sexual abuse progressed to intercourse" and the court redacted that portion of her testimony, but Daughter Two and Daughter Three did not make similar

---

8. According to Perry, Daughter Two claimed she was abused until she was almost seventeen years old. However, Daughter Two was explaining how old she was when Perry moved to Columbia when she referred to being almost seventeen years old. Daughter Two stated Perry did not abuse her when he lived in Columbia, and she explicitly stated on cross-examination that the abuse ended when she was fifteen years old. We note other witnesses stated she informed them the abuse ended when she was sixteen years old.

9. Newcomer never stated a specific time the abuse occurred, only that it occurred at night; however, Daughter Two and Daughter Three testified the abuse occurred between five and six a.m., when it was still dark outside.

allegations. However, Newcomer never testified that intercourse occurred. During a discussion with the trial court before the proffer, the solicitor noted that unlike with Daughter Two and Daughter Three, Perry's abuse of Newcomer "progress[ed] on into actual vaginal/penile penetration." The solicitor acknowledged that portion of Newcomer's account of the abuse would "not be admissible because it [went] beyond the scope of similar" and could be excluded by the court pursuant to *Wallace*. During the proffer, Newcomer testified that Perry had digitally penetrated her numerous times and then stated the abuse progressed when she was thirteen or fourteen. She stated, "One incident, I had two friends over. He snuck into my bedroom. The penetration and everything started. Then he got up and left." Before the jury, Newcomer testified regarding the digital penetration and included the fact that the abuse had progressed to oral sex once. Although Newcomer's proffered testimony regarding the abuse progressing and the penetration starting could have been a reference to sexual intercourse, it is not clear from her testimony whether sexual intercourse occurred. Because the only information in the record about Perry and Newcomer engaging in sexual intercourse came from the solicitor, this court cannot consider that information when determining whether Newcomer's testimony was admissible under Rule 404(b). *See Ex parte Morris*, 367 S.C. 56, 64, 624 S.E.2d 649, 653 (2006) ("It is well established that counsel's statements regarding the facts of a case and counsel's arguments are not admissible evidence."). However, even assuming arguendo that sexual intercourse occurred and can be considered by this court, it was permissible for the trial court to redact any dissimilar portions of Newcomer's testimony in light of all of the existing similarities. *See Wallace*, 384 S.C. at 435, 683 S.E.2d at 278 ("[T]he trial court may properly redact dissimilar particulars of sexual conduct to avoid unfair prejudice to the defendant.").

In light of the foregoing, the similarities of the prior bad act and the charged crimes outweigh the dissimilarities. *See id.* at 433, 683 S.E.2d at 278 ("When the similarities outweigh the dissimilarities, the bad act evidence is admissible under Rule 404(b)."). Accordingly, the trial court did not abuse its discretion in finding Newcomer's testimony was admissible under

Rule 404(b), SCRE. *See Saltz*, 346 S.C. at 121, 551 S.E.2d at 244 (stating "[t]he admission or exclusion of evidence is left to the sound discretion of the trial [court]," and the court's "decision will not be reversed on appeal absent an abuse of discretion").

### B. Rule 403, SCRE

■ Perry next contends that if this court finds Newcomer's testimony admissible under Rule 404(b), it should still be excluded because the probative value of the testimony was substantially outweighed by the danger of unfair prejudice. We disagree.

Once the prior bad act is found admissible under Rule 404(b), the trial court must then conduct the prejudice analysis required by Rule 403, SCRE. *Wallace*, 384 S.C. at 435, 683 S.E.2d at 278. Rule 403 states, in pertinent part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." "[E]ven though we have already considered, pursuant to Rule 404(b), whether the similarities outweighed the dissimilarities, we must now reconsider the similarities and dissimilarities, as well as temporal remoteness and other factors, pursuant to Rule 403...." *Scott*, 405 S.C. at 506, 748 S.E.2d at 245; *see also State v. Taylor*, 399 S.C. 51, 61, 731 S.E.2d 596, 601–02 (Ct. App. 2012) (reconsidering the similarities of the prior bad act and the charged crime to ascertain total probative value and, subsequently, comparing this probative value to the danger of unfair prejudice).

■ Evidence is unfairly prejudicial if it has an undue tendency to suggest a decision on an improper basis. *State v. Spears*, 403 S.C. 247, 253, 742 S.E.2d 878, 881 (Ct. App. 2013). "The determination of the prejudicial effect of the evidence must be based on the entire record and the result will generally turn on the facts of each case." *State v. Fletcher*, 379 S.C. 17, 24, 664 S.E.2d 480, 483 (2008).

Perry first argues the trial court, when performing its Rule 403 analysis, failed to consider the fact that Newcomer testified the abuse progressed to intercourse, which was different from Daughter Two's and Daughter Three's testimony. As

noted above, the only information in the record about Perry and Newcomer engaging in sexual intercourse came from the solicitor during a discussion with the trial court before the proffer; Newcomer never explicitly testified intercourse occurred. Therefore, the trial court was not permitted to consider this information. *See Ex parte Morris*, 367 S.C. at 64, 624 S.E.2d at 653 ("It is well established that counsel's statements regarding the facts of a case and counsel's arguments are not admissible evidence.").

Perry also contends the prior bad act testimony was inadmissible under Rule 403 because there was an issue regarding whether the prior bad act actually occurred. We are cognizant of the fact that Perry was never convicted of the prior bad act; however, as stated above, the trial court correctly found there was clear and convincing evidence that the prior bad act occurred.

Perry next asserts the prior bad act testimony was inadmissible under Rule 403 because of the temporal remoteness between the prior bad act and the charged offenses. When remoteness is an issue in a case, it "is pertinent to determining total probative value." *Scott*, 405 S.C. at 506, 748 S.E.2d at 245. Nonetheless, the trial court does not necessarily err when it permits testimony about a bad act occurring many years prior to the charged crime. *See State v. Tutton*, 354 S.C. 319, 332 n.5, 580 S.E.2d 186, 193 n.5 (Ct. App. 2003) ("Remoteness in time, however, is not dispositive."); *see also Scott*, 405 S.C. at 509, 748 S.E.2d at 247 ("The trial court did not abuse its discretion in admitting evidence of [the appellant's] bad acts, occurring some eleven to twenty years prior to the crimes charged."); *State v. Blanton*, 316 S.C. 31, 33, 446 S.E.2d 438, 440 (Ct. App. 1994) ("That the alleged acts perpetrated against the two witnesses occurred some seven to eight years prior to the alleged molestation of [the victim] is not alone dispositive."). Although the prior bad act occurred seven to nine years before the abuse of Daughter Two and fourteen or fifteen years before the abuse of Daughter Three,[10] we do

10. Newcomer was thirty-six at the time of the December 2014 trial and testified the abuse ended when she was fourteen years old, or in approximately 1992. Daughter Two testified she was born in 1994 and the abuse began when she was between five and seven years old, or

not believe this gap diminishes the probative value of Newcomer's testimony, especially when considering the fact that Daughter Two and Daughter Three were not born until approximately two and four years, respectively, after the abuse of Newcomer ended.

Furthermore, the similarities between the prior bad act and the charged crimes outweigh the dissimilarities, and the dissimilarities do not result in the danger of unfair prejudice substantially outweighing the probative value. *See* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."). Accordingly, the trial court did not abuse its discretion in admitting Newcomer's testimony. *See Saltz*, 346 S.C. at 121, 551 S.E.2d at 244 (stating "[t]he admission or exclusion of evidence is left to the sound discretion of the trial [court]," and the court's "decision will not be reversed on appeal absent an abuse of discretion").

## II. Improperly Commenting on Veracity of Testimony

 Perry argues the trial court erred in finding Dr. Henderson did not improperly comment on the veracity of Daughter Three's testimony. We disagree.

 "While experts may give an opinion, they are not permitted to offer an opinion as to the credibility of others." *State v. Chavis*, 412 S.C. 101, 109, 771 S.E.2d 336, 340 (2015). "Specifically, it is improper for a witness to testify as to his or her opinion about the credibility of a child victim in a sexual abuse matter." *State v. Kromah*, 401 S.C. 340, 358–59, 737 S.E.2d 490, 500 (2013).

In *State v. Jennings*, our supreme court considered the admission of a forensic interviewer's reports, which included statements that each child victim had provided "a compelling disclosure of abuse" and had provided details that were consistent with the background information the forensic interviewer had received from their mother, the police report, and the other children. 394 S.C. 473, 480, 716 S.E.2d 91, 94 (2011). Our

between approximately 1999 and 2001. Daughter Three testified she was born in 1996 and the abuse began when she was about ten or eleven years old, or in approximately 2006 or 2007.

supreme court found the trial court erred in admitting the reports, stating, "There is no other way to interpret the language used in the reports other than to mean the forensic interviewer believed the children were being truthful." *Id.*; *see also Kromah*, 401 S.C. at 359, 737 S.E.2d at 500 (finding the forensic interviewer's testimony about a "compelling finding" was inappropriate because it "was the equivalent of [the forensic interviewer] stating [the victim] was telling the truth"); *State v. Dawkins*, 297 S.C. 386, 387, 393–94, 377 S.E.2d 298, 299, 302 (1989) (finding improper a psychiatrist's affirmative response when asked his opinion as to whether the victim's symptoms of sexual abuse were "genuine"); *State v. Dempsey*, 340 S.C. 565, 568–69, 571, 532 S.E.2d 306, 308–09 (Ct. App. 2000) (finding an expert in child sexual abuse improperly vouched for the victim when he testified that children are truthful in ninety-five to ninety-nine percent of the instances in which sexual abuse is alleged).

■ However, when the expert witness gives no indication about the victim's veracity, it does not amount to bolstering. In *State v. Douglas*, a forensic interviewer described the method she generally used to interview child sexual abuse victims and stated that after she interviewed Douglas's victim, she recommended the victim be taken for a medical examination. 367 S.C. 498, 516–17, 626 S.E.2d 59, 68–69 (Ct. App. 2006). This court considered the forensic interviewer's testimony and found "[t]he only reasonable inference the jury could have drawn from [the interviewer's] testimony [was] that she believed the victim told the truth about being sexually assaulted." *Id.* at 520, 626 S.E.2d at 71. Despite this finding, this court determined the defendant had not shown the jury's verdict was influenced by the interviewer's testimony, and it ultimately affirmed the defendant's conviction. *Id.* at 520–21, 527, 626 S.E.2d at 71, 74. Our supreme court granted certiorari and affirmed the result; however, it determined the court of appeals erred in concluding the only reasonable inference to be drawn from the forensic interviewer's testimony was that she believed the victim was telling the truth. 380 S.C. 499, 503–04, 671 S.E.2d 606, 609 (2009). Our supreme court noted the forensic interviewer described her general procedure for conducting a forensic interview, stating she and the child she was interviewing would talk "a lot about telling the truth" and

would make "an agreement with each other that [she would] tell [the child] the truth and that [the child would] tell [her] the truth[;] if [they got] past that, if the child [agreed] to do that, [they would] go on." *Id.* at 504, 671 S.E.2d at 609. However, our supreme court noted that when the forensic interviewer described her interview with the victim in the case at issue, she "never stated she believed [the victim]; she did not even state the [victim] .... agreed to tell her the truth, and she gave no indication concerning [the victim's] veracity." *Id.* at 503–04, 671 S.E.2d at 609; *see also State v. Smith*, 411 S.C. 161, 172–73, 767 S.E.2d 212, 218 (Ct. App. 2014) (finding the State's question regarding whether the length of a delay affects the credibility of a disclosure of abuse was inappropriate because it invited vouching and the social worker's initial response, when viewed in isolation, would constitute vouching, but ultimately finding no reversible error after considering the entirety of the social worker's testimony and recognizing the social worker had qualified his response and had never given an opinion regarding whether the victim was telling the truth).

In the instant case, the following exchange occurred during Dr. Henderson's discussion of her examination of Daughter Three:

Q. Okay. Based on what Daughter Three shared with you, did you expect to find any indications of injury?

A. It would have been very unlikely based on the information that she had shared to find anything on the exam.... The incidents had happened at least three years prior. So the genital area has incredibly good blood supply and even small tears or even larger tears can heal very, very quickly. So with there being years delay between the last incident and the time of the exam, it would make it unlikely to find something on the exam....

Q. [W]hat were the findings of your examination?

A. She had a little bit of discharge.... [T]he rest of her exam was normal.

Q. And what is—what does normal mean?

A. Normal means that there were no tears, no scars, ... and there were no specific findings on her exam that in and of itself would have linked to allegations of abuse. But in light of what she had shared with me and, as I mentioned,

finding a normal exam is something quite common and not surprising in this particular case.

Q. So in your opinion, were your findings consistent with Daughter Three having experienced sexual abuse?

A. Yes.[11]

Although the "consistent with sexual abuse" question was inartfully worded, the response it elicited did not amount to improper bolstering. Arguably, when considered in isolation, Dr. Henderson's response could be interpreted as she believed Daughter Three's allegations and, therefore, also believed Daughter Three could have been sexually abused despite her normal examination. However, when reviewing the entirety of Dr. Henderson's testimony, it is unlikely her response would reasonably be viewed by the jury as a comment on the credibility of Daughter Three. *See Smith*, 411 S.C. at 172–73, 767 S.E.2d at 218 (considering the objected-to response of the expert witness in the context of his entire testimony and finding the expert's testimony did not improperly bolster the victim's credibility). Dr. Henderson explained that Daughter Three's examination was normal and "there were no specific findings on her exam that ... would have linked to allegations of abuse." She also noted that normal results are common in instances where there is a delayed disclosure. In light of this testimony, the most likely interpretation of Dr. Henderson's response to the "consistent with sexual abuse" question is that normal examination results do not rule out a sexual assault in delayed disclosure cases. *Cf. Chavis*, 412 S.C. at 109, 771 S.E.2d at 340 (finding the expert's recommendation that the appellant not be around the victim for any reason could "*only be interpreted* as [the expert] believing [the victim's] claim that [the appellant] sexually abused her" (emphasis added)); *Jennings*, 394 S.C. at 480, 716 S.E.2d at 94 (finding the trial

11. Dr. Henderson also testified that Daughter Two had a normal examination, which she said was "quite common ... with those type of allegations." When asked whether her findings regarding Daughter Two were consistent with the possibility that Daughter Two had also experienced sexual abuse, Dr. Henderson stated, "Yes, a normal exam would be consistent with those types of findings, with those allegations that she had made." She explained that even with long-term abuse, it is very uncommon to see evidence of the abuse during the examination. Perry did not object to this testimony during the trial and has not challenged this testimony on appeal.

court erred in admitting the forensic interviewer's reports because *"[t]here [was] no other way to interpret* the language used in the reports other than to mean the forensic interviewer believed the [child victims] were being truthful" (emphasis added)).

Moreover, although Dr. Henderson mentioned that she considered Daughter Three's history, Dr. Henderson did not comment on the truthfulness of that history or repeat to the jury the details of what Daughter Three had told her. Additionally, she never commented on Daughter Three's veracity. *See Douglas*, 380 S.C. at 503–04, 671 S.E.2d at 609 (finding the forensic interviewer did not vouch for the victim's veracity when the interviewer never stated she believed the victim and gave no other indication concerning the victim's veracity). Furthermore, Dr. Henderson was permitted to provide this opinion, as it could assist the jury in understanding the effect of a delayed disclosure on the results of a medical examination. *See* Rule 702, SCRE ("If . . . specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."). Accordingly, we affirm the trial court's determination that Dr. Henderson did not improperly comment on the veracity of Daughter Three's testimony.

## CONCLUSION

For the foregoing reasons, we affirm Perry's convictions.

**AFFIRMED.**

MCDONALD and HILL, JJ., concur.