HILL, J.:
Convicted by a jury of the murder of Quantez Greer and the attempted armed robbery of Jessica Power, Walter Tucker appeals, claiming the trial judge erred by (1) denying his motion for directed verdict; (2) admitting prior bad act evidence against him in violation of Rules 403 and 404, SCRE ; and (3) denying his motion for a new trial and refusing to hold a full evidentiary hearing on his claim of juror misconduct. We affirm.
I.
Jessica Power knew Walter Tucker from their shared interest in marijuana. When Power's friend Quantez Greer wanted to buy some, she steered him to Tucker. On September 6, 2012, Power and Greer drove to meet Tucker in Beaufort at a trailer owned by Antonio Brewer to close the deal. After Power hid $2,500.00 of Greer's cash in her purse, she and Greer walked to the front door of the trailer. Tucker let Power in, but quickly shut the door and locked it, leaving Greer outside. Once inside, Power noticed another person, later identified as Travis Polite, reclining on a couch. Tucker pointed a handgun at Power and demanded she hand over the money. When she refused, someone pushed her to the floor. Tucker fumbled with Power's purse but could not find any money in it, so he threw it back to her and again demanded she produce the money. Power testified she retrieved the money and gave it to Tucker. At this point, the drug deal went from bad to worse. Polite asked Tucker for his gun, which Tucker passed to him as Polite bounded out the front door. Power testified she then heard a gunshot outside, and Tucker, who had drawn another gun, ran out the front. Power next heard multiple gunshots coming from the yard, and she retreated further into the trailer's interior. A third man, presumably Antonio Brewer, burst from a bedroom and fled out the back door. Power then scampered out the back as well, seeking refuge under her ex-boyfriend's nearby trailer. Power testified Tucker called her on her cell phone while she was hiding and told her if she said anything about the events "he would hurt my family and kill me."
Responding to 911 calls reporting the gunshots, police arrived on scene to find Greer lying on the ground dead from what was later determined to be a gunshot wound to the chest. After further investigating the scene and interviewing witnesses, including Power and Brewer, police obtained an arrest warrant for Tucker, who was later apprehended hiding under a sink at his brother's home in Asheville, North Carolina.
Keamber Bigelow met Tucker in Savannah in the fall of 2014 while he was awaiting trial. She testified Tucker told her he did not have anything to do with Greer's murder, but "he wasn't sure. He said he was running and that he was shooting and his adrenaline was high." Tucker told Bigelow that Power would not testify because he had threatened her, and that he needed someone named Cedrick a.k.a. Savage to kill Polite. According to Bigelow, Cedrick drove a black Camry with a pistol hidden under the gearshift. Bigelow had, in turn, given this information to law enforcement, and an investigator located a Cedrick A. McDuffy in custody in Hampton County. His booking record showed he had "Savage" tattooed on his chest. A search of Cedrick's impounded black Camry revealed a pistol hidden in the gearshift. An incident report from a recent traffic stop of Cedrick listed Tucker and Bigelow among his passengers in the Camry.
The State tried Polite in January 2015, and a jury convicted him of Greer's murder. The *470 State claimed Polite fired the fatal shot, but prosecuted Tucker for murder under a theory of accomplice liability, kidnapping, and armed robbery. Brewer, who had testified in Polite's trial, was shot and killed a few weeks before Tucker's April 2015 trial.
The jury convicted Tucker of murder and attempted armed robbery, but acquitted him of kidnapping. After his conviction, Tucker moved for a new trial, asserting a juror (Juror A) had not disclosed her friendship with Brewer and Quornisha Jones, a listed but uncalled State's witness. After hearing arguments from counsel and reviewing affidavits, the trial judge denied Tucker's motion for new trial and his request for further hearing on the jury misconduct issue.
II.
Tucker first claims the trial judge should have directed a verdict in his favor. We must view the evidence in the light most favorable to the State, and we see plenty to support the elements of murder and attempted armed robbery. See State v. Bennett , 415 S.C. 232, 235, 781 S.E.2d 352, 353 (2016). Power's recounting of Tucker seizing her purse at gunpoint was sufficient proof of his specific intent to commit armed robbery. Her testimony of hearing gunshots after Tucker ran outside brandishing a pistol, together with Bigelow's testimony and evidence of Greer's cause of death, were enough to carry the murder charge to the jury on the theory of accomplice liability, as they showed he was an active participant not a mere bystander. See State v. Harry , 420 S.C. 290, 300, 803 S.E.2d 272, 277 (2017). Cellphone tower records, DNA evidence from a drink bottle found at Brewer's trailer, and a neighbor's testimony about seeing a dark mid-sized sedan (similar to one Tucker had previously been seen driving) leaving the area corroborated Tucker's presence at the scene when the murder was committed. Because this was sufficient evidence for a reasonable jury to find Tucker guilty beyond a reasonable doubt, we affirm the denial of Tucker's directed verdict motion. See Bennett , 415 S.C. at 236-37, 781 S.E.2d at 354.
III.
We next take up Tucker's contention that the trial judge erred in allowing Bigelow to testify about Tucker's plan to engage Cedrick to kill Polite and his threatening of Power.
Tucker claims this was improper character evidence forbidden by Rule 404(b), SCRE, and not reliable enough to meet the clear and convincing standard the rule sets. We must affirm a trial judge's ruling on the admission of prior bad act evidence if any evidence supports it. State v. Perry , 420 S.C. 643, 655, 803 S.E.2d 899, 905 (Ct. App. 2017). Evidence of witness intimidation may be admitted to show "consciousness of guilt" without running afoul of Rule 404(b)'s prohibition against propensity evidence. State v. Edwards , 383 S.C. 66, 72, 678 S.E.2d 405, 408 (2009). Proof that Tucker made the threats satisfies Rule 404(b)'s reliability test. See id . at 72-73, 678 S.E.2d at 408. Still, Tucker believes Bigelow's reliability evaporated during cross-examination, or at least eroded to a level below clear and convincing. How the jury weighs intimidation evidence is irrelevant to its threshold admissibility. Equally immaterial is whether Polite knew about the threat. The relevance of a defendant's threatening of a witness rests on proof it was said, not that it was heard, for the probative force springs from the speaker's awareness of his guilt.
The trial judge's careful consideration of this critical issue was exemplary. Faithful to Edwards , the trial judge properly admitted evidence of Tucker's witness intimidation and was well within his discretion in finding the probative value of the evidence was not substantially outweighed by any of the risks of undue prejudice recognized by Rule 403, SCRE. See Perry , 420 S.C. at 660, 803 S.E.2d at 908.
IV.
We last address whether the trial judge erred by denying Tucker's new trial motion and refusing to hold a full evidentiary hearing on his claim Juror A committed misconduct.
Our state and federal constitutions guarantee a criminal defendant the right to *471 an impartial jury, and "voir dire can be an essential means of protecting this right." Warger v. Shauers , --- U.S. ----, 135 S.Ct. 521, 528-29, 190 L.Ed.2d 422 (2014) ; U.S. Const. amends. VI, XIV ; S.C. Const. art. I, § 14 ; see also State v. Coaxum , 410 S.C. 320, 327-28, 764 S.E.2d 242, 245 (2014). We review a ruling on a new trial motion based on a juror's alleged concealment during voir dire for abuse of discretion. Lynch v. Carolina Self Storage Centers, Inc ., 409 S.C. 146, 151, 760 S.E.2d 111, 114 (Ct. App. 2014). A new trial is warranted when: (1) the juror intentionally concealed information, and (2) the information withheld would have triggered a challenge for cause or been material to a party's choice to use a preemptory challenge. State v. Woods , 345 S.C. 583, 587, 550 S.E.2d 282, 284 (2001). "[I]ntentional concealment occurs when the question presented to the jury on voir dire is reasonably comprehensible to the average juror and the subject of the inquiry is of such significance that the juror's failure to respond is unreasonable." State v. Galbreath , 359 S.C. 398, 404 n.2, 597 S.E.2d 845, 848 n.2 (Ct. App. 2004).
Classifying the concealment "is a fact intensive determination which must be made on a case by case basis." Woods , 345 S.C. at 588, 550 S.E.2d at 284. The classification carries consequences: a juror who intentionally conceals is presumptively biased; "[o]n the other hand, where the failure to disclose is innocent, no such inference may be drawn." Id . A party alleging innocent or unintentional nondisclosure "has a heightened burden to show that the concealed information indicates the juror is potentially biased, and that the concealed information would have been a material factor in the party's exercise of its peremptory challenges." Coaxum , 410 S.C. at 329, 764 S.E.2d at 246.
During voir dire , the State read a list of the potential witnesses to the venire, including the names Antonio Brewer and Quornisha Jones. The trial judge then asked if any member of the venire had "ever had a close personal or social relationship with" any of the listed witnesses. No one responded affirmatively as to Brewer or Jones.
Tucker supported his new trial motion with Jones' affidavit, which stated she was a "co-worker and friends" with Juror A, and further alleged:
About 1 week after [Juror A] served on the jury, [Juror A] saw me at work and stopped me. She ask[ed] me "what did you get yourself into girl." [Juror A] then [told] me that she had been on the jury. [Juror A] said that she believed that [Tucker] was responsible for Antonio Brewer being killed 2 weeks before trial. [Juror A] was friends with Antonio
Brewer and his child's mother who was also shot 2 weeks prior to trial.
Jones attached several social media screenshots to show she and Juror A followed each other and commented on each other's posts. The last screenshot depicted a direct message sent by Juror A to Jones several days after Tucker informed the State and the judge of his claim of juror misconduct. The direct message stated "Call me" and left a phone number.
At the hearing on Tucker's post-trial motions, Tucker asserted Jones' affidavit, combined with the screenshots, constituted a threshold showing Juror A had intentionally concealed her relationship with Jones and Brewer during voir dire , entitling him to a full evidentiary hearing. In response, the State introduced an affidavit from Juror A, which stated:
I am neither friends with [Jones] nor [Brewer] .... I did not have any discussions about this case with [Jones] or [Brewer] .... I have not had any discussions where I blamed [Tucker] for the death of [Brewer].
The trial judge denied Tucker's request for a full evidentiary hearing and, in a written order, found "no credible evidence that [Juror A] concealed any information from the Court."
The unambiguous voir dire question asked about "a close personal or social relationship" with Jones. Ample evidence supports the trial judge's finding Juror A, who worked at a local hospital with Jones, did not conceal a close personal or social relationship with her. In her affidavit, Jones states she *472 "would describe our relationship as co-workers and friends." The screenshots show Jones is just one of 347 people Juror A follows and one of 605 that follow her, hardly an intimate circle. When Juror A direct-messaged Jones asking her to call, Juror A left her phone number, implying Jones did not already have it. The only other communication the two had on social media occurred thirty-six weeks before: a brief, two-line exchange where Jones explained Juror A had not seen her lately because Jones was now working on a different floor. This explanation suggests a relationship confined to sporadic contact at work, and belies closeness. See Galbreath , 359 S.C. at 403-04, 597 S.E.2d at 847-48 (finding no intentional concealment of "close personal friendship or business relationship" by juror when affidavits demonstrated only that juror knew members of victim/witness' family and juror's family members rented property from victim/witness' family). Even if we assumed the voir dire inquiry was ambiguous and could be reasonably understood as asking about any social relationship, however slight, with a listed witness, Tucker has not shown Juror A's failure to respond prejudiced him: he does not demonstrate how Juror A was potentially biased against him due to her tie to Jones, nor how the tie would have been material to his peremptory strike choices. See Coaxum , 410 S.C. at 329, 764 S.E.2d at 246 (party claiming unintentional concealment must prove prejudice by showing potential bias and materiality to strike decision); Woods , 345 S.C. at 588, 550 S.E.2d at 284 (unintentional concealment occurs when voir dire question is ambiguous).
Tucker points out another seated juror (Juror B) was excused by the trial judge before the trial began after she disclosed she worked with Jones and Jones had approached her at work, confiding she was "scared" to testify. We find Juror A and Juror B's positions categorically different, as Jones' interaction with Juror B occurred before the trial, was initiated by Jones, referred to the case and her role as a witness, and was characteristic of a close personal relationship. Both the State and Tucker agreed to Juror B's dismissal because she had gained independent knowledge about the case from Jones. Finally, Tucker's claim Juror A was biased to convict him as retribution for Brewer's demise depends on a belief in the truth of Jones' affidavit, which the trial judge deemed incredible. See State v. Johnson , 413 S.C. 458, 467-68, 776 S.E.2d 367, 371-72 (2015) (credibility determinations are findings of fact); State v. Baccus , 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006) (findings of fact will not be disturbed in criminal cases unless clearly erroneous).
Tucker insists the trial judge erred by denying him a further evidentiary hearing, asserting Jones' affidavit presented a colorable claim of intentional concealment requiring live testimony. We disagree. In State v. Aldret , the South Carolina Supreme Court set the procedure trial judges must follow when deciding juror misconduct claims arising after verdict. 333 S.C. 307, 315-16, 509 S.E.2d 811, 815 (1999) ; see also State v. Covington , 343 S.C. 157, 163-64, 539 S.E.2d 67, 70 (Ct. App. 2000) (adopting Aldret procedure in a case involving alleged intentional concealment during voir dire ). As the party alleging misconduct, Tucker bore the burden of proving Juror A was biased or otherwise lacked ability to follow her oath. Aldret , 333 S.C. at 315-16, 509 S.E.2d at 815. The trial judge may consider affidavits and, if it finds them credible, should convene an evidentiary hearing. Id. We decline to adopt a more rigid approach as Tucker proposes, where the mere allegation of misconduct mandates a full-blown adversarial hearing. Unless the trial judge finds the moving party's affidavits credible, our rules wisely forbid exposing jurors to open-ended inquiries into how they performed their duty. See Tanner v. United States , 483 U.S. 107, 120-21, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) ("Allegations of juror misconduct ... raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." (citation omitted) ).
Leaving credibility determinations in jury misconduct claims to trial judges means respecting *473 their decision that they have enough evidence to weigh it at all, whether the witness' testimony is spoken or written. Assessing credibility often works best with live testimony, but a trial judge's senses still function when reviewing affidavits. One can judge credibility by appraising what and how people communicate, in person or on the page. The trial judge does not have to take the allegations as true and is free to gauge their reliability. A judge cannot, for example, be forced to concede the credibility of a witness' statement that the earth is flat; dressing nonsense up in an affidavit does not clothe it with eternal verity.
The trial judge had enough material before it to measure Jones' credibility. After all, Jones was a potential witness to the crimes because the State believed she had rented the getaway car. She was also the erstwhile girlfriend of Brandon Singleton, Tucker's co-defendant, who was awaiting trial on charges arising out of the robbery and murder. Jones did not give her affidavit until six months after Tucker's trial, although she claimed to have "disclosed this information previously to Brandon, but because we were arguing I was unwilling to come forward before."
We explain all of this to highlight the prime position of the trial judge to make credibility determinations, an advantage magnified when judging juror misconduct:
[T]he reasons for refusing to interfere with the discretion of a circuit judge in matters involving the purity of the jury box and the integrity of verdicts are peculiarly strong. He is in the atmosphere of the trial, and has opportunity to estimate the character and intelligence of the jurors, as well as of the person charged with improper conversation or corrupt dealings with them .... These and perhaps other things afford the trial judge such superior means of coming to a just conclusion, that before disturbing his order on such a subject, an appellate court should require very clear evidence of abuse of discretion.
McGill Bros. v. Seaboard Air Line Ry ., 75 S.C. 177, 180, 55 S.E. 216, 217 (1906). We grant "broad deference" to the trial judge's credibility conclusions in claims of jury misconduct. State v. Harris , 340 S.C. 59, 63, 530 S.E.2d 626, 628 (2000). We see no error in the trial judge's finding Tucker failed to prove Juror A intentionally concealed a close relationship with Jones or harbored bias related to Jones or Brewer.
Tucker's convictions are
AFFIRMED.
THOMAS and GEATHERS, JJ., concur.