**THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Rodney C. Bryan, Petitioner/Respondent,

v.

State of South Carolina, Respondent/Petitioner.

Appellate Case No. 2019-001887

———————

**ON WRIT OF CERTIORARI**

———————

Appeal From Lexington County
Edgar W. Dickson, Post-Conviction Relief Judge

———————

Opinion No. 2024-UP-132
Heard December 6, 2023 – Filed April 24, 2024

———————

**AFFIRMED IN PART, REVERSED IN PART, AND AND REMANDED**

———————

Appellant Defender Laura Mary Caudy, of Columbia, for Petitioner/Respondent.

Attorney General Alan M. Wilson and Assistant Attorney General Joshua Abraham Edwards, both of Columbia, for Respondent/Petitioner.

**PER CURIAM:**  Rodney C. Bryan was convicted of criminal domestic violence of a high and aggravated nature (CDVHAN), kidnapping, violating an order of protection, and one count of spousal sexual battery.  After a complicated procedural history leading to our review of the post-conviction relief (PCR) court's order, including the grant of a belated appeal, this matter is affirmed in part, reversed in part, and remanded.

**FACTS**

In September 2007, a Lexington County grand jury indicted Bryan for violation of a court order of protection, CDVHAN, two counts of spousal sexual battery, and kidnapping stemming from a multi-day altercation with his wife (Victim) earlier that month.

Bryan and Victim share three children, A.B., D.B., and S.B., who were ten, seven, and four years old respectively at the time of trial.  Julie Gies, the guidance counselor at A.B. and D.B.'s school, testified at trial she spoke with the children several days after the weekend incident at issue based on concerns expressed by A.B.'s teacher.  Gies called the school's resource officer, Officer Brian Setree, to report the situation.  The children were all taken into emergency protective custody (EPC).[1]

At trial, A.B. recalled that on Friday, Bryan and Victim picked up her, D.B., and S.B. from daycare.  A.B. stated that Victim and Bryan got into a fight in the car and "Dad hit Mom, and Momma hit the wheel."  According to A.B., Victim then drove home and when they arrived, Bryan went beside the house where the phone line entered the house with a "cutting wire tool."  A.B. testified Bryan came back into the house and Victim put on a movie.  She explained Bryan tried to hurt Victim again, and she attempted to call the police; however, the phone did not work.  A.B. recalled she went outside and observed the cut phone line.  According to A.B., when she and D.B. tried to go to the neighbor's house, Bryan "rushed" over to D.B., picked him up by the stomach, and "squeezed" his waist.  A.B. testified that the children started crying and Bryan put D.B. down.  She explained that the next day, Bryan and Victim fought again.  On Monday, A.B. returned to school.

---

[1] The children were eventually returned to Victim's custody.

D.B. testified similarly to his sister and stated they were going to call the police Friday evening but the phone was not working. He indicated they went outside and saw the phone line was cut. D.B. stated that when he tried to go to the neighbor's house to use the phone, his father grabbed him up and squeezed his stomach. D.B. testified he woke up Saturday night because he heard Victim and Bryan fighting. According to D.B., he walked into the living room and saw Bryan choking Victim. He explained Bryan told him to go back to bed and stopped choking Victim.

Victim testified she and Bryan were married and had three children together. She explained she obtained an order of protection against Bryan in March 2007. However, Bryan continued to call and come to her house, and in July 2007, she let Bryan move back into her house because he needed a place to stay. Victim stated that on Friday, September 14, 2007, she and Bryan drove to daycare to pick up their three children. She indicated that while Bryan was inside the daycare, she went through his phone. Victim testified that when he returned to the car, he saw what she had done, screamed at her, and hit her.

Victim testified the family arrived home and while the kids went inside, Bryan stayed outside. She explained the kids were crying and went to use the phone, but it did not work. Victim indicated she started a movie for the kids to watch and went into the bathroom. She stated Bryan came in and choked her, pulled her hair, and slapped her again. Victim recalled that later that night, she put the children to bed and went to sleep on the couch, but Bryan woke her up and said she had to sleep in the bed because he did not want her to leave in the middle of the night. She explained he took her into the bedroom and had sex with her, but she did not want to have sex with him. Victim indicated that although she cried, she did not fight him because he held her arms down.

Victim testified that on Saturday, she tried to make it through the day, "moment by moment," and that every so often, Bryan would scream at her. She stated that when she thought Bryan was taking a shower in the evening, she tried to walk out the door, and he came around the corner and grabbed her arm stating, "Where the f*** do you think you're going? And I didn't tell you you could go anywhere." According to Victim, Bryan told her to sit on the couch and he paced back and forth in front of her before starting to choke her. She stated he took out his pocket knife and alternated between choking her and gesturing with his knife, stating, "I'm gonna f**** kill you." Victim explained D.B. came into the room, but she did not hear what D.B. said because she was trying to breathe. She stated Bryan then

grabbed her by the hair and dragged her to the bedroom. According to Victim, Bryan told her to have oral sex with him, but when she refused, he pushed her down and had sex with her. When questioned why she did not fight back, Victim replied, "It was like it was happening to someone else; it wasn't really me that it was happening to."

When Victim was asked why she did not leave to go to a neighbor's house, she replied she did not think she could take the kids and make it out of the yard. Victim testified she could not remember what happened on Sunday morning but that even if Bryan had left the house, she would not have left because she "gave up" and felt embarrassed and humiliated. Victim indicated police came to her house the following Thursday; however, she did not tell them what happened because she believed that even if police arrested Bryan, he would be out of jail in a short time and would be angry that she turned him into police. She explained she later found out her children were taken into EPC and Bryan was arrested.

On cross-examination, trial counsel questioned Victim regarding her ability to remember details from the weekend. Trial counsel also asked Victim whether she could leave the house that weekend, and Victim acknowledged it was "common sense" that she could have gone to the neighbor's house. However, she also stated "When I tried to leave that Saturday evening, he jerked me back in the house . . . . He took the keys. He told me not to leave the house." Trial counsel asked Victim, "Do you have times when you don't remember things a lot?" Victim responded, "When I'm hit in the head a lot, yeah." Victim acknowledged that during her job as a correctional officer with the Department of Corrections, she received self-defense training to assist her in the event someone assaulted her at work. She also stated she did not report any allegations to police until her children were removed from her custody.

Dr. Catherine Ross, who was qualified as an expert in the field of criminal domestic violence, testified she conducted individual counseling in a community program with Sistercare. She explained she met with Victim once before trial, in November 2007, and she had been present in the courtroom when Victim testified. The solicitor asked Dr. Ross, "Was there anything about [Victim's] ability to remember or not remember that was—was that consistent or inconsistent with a woman who's been a victim of domestic violence?" She replied, "It's very, very consistent; very consistent." Dr. Ross continued, "And—and I was watching in the courtroom . . . . [S]he's been re-traumatized again by having to relive all of these experiences."

Dr. Ross further testified that Victim's actions were "very consistent with a person who's been a victim of domestic violence." Regarding her failure to call police, Dr. Ross stated, "It's consistent because part of the trauma is—especially after being choked [and] being raped, she's in shock." She explained Victim's reluctance to ask police for help when they came to her house was "very consistent" with "traumatic bonding." Dr. Ross further indicated that Victim's failure to report the abuse until her children were in EPC and Bryan was arrested was "very consistent" as part of a "post-traumatic stress response." When asked whether there was anything in Victim's testimony that was "inconsistent with a woman who's been a victim of domestic violence, who's been kidnapped by her spouse, or has been raped by her spouse?" Dr. Ross declared "No, sir. There's nothing that was inconsistent." Trial counsel did not object to any of the questions or responses.

Officer Setree testified that after he was contacted by the school guidance counselor, he began investigating the family and discovered Victim had an active order of protection against Bryan. Officer Setree indicated that after he spoke to A.B. and D.B., police arrested Bryan. According to Officer Setree, five days after Bryan's arrest, Officer Setree met Victim for the first time at the courthouse for an EPC hearing. A few days after the hearing, Officer Setree went to Victim's home. He testified "[t]hey have a phone line that goes in through the bedroom. . . . I also noticed that the phone line had been repaired. It looked like it had been cut prior, and then taped back together."

During closing arguments, the solicitor argued to the jury that Dr. Ross's testimony supported Victim's actions, explaining she acted "consistent with somebody who's been physically abused, kidnapped and held against their will by their spouse, [and] raped by their husband."

The jury found Bryan guilty on all counts except for a second count of spousal sexual battery. The trial court sentenced Bryan to thirty days' imprisonment for violation of a court order of protection, ten years' imprisonment for CDVHAN, ten years' imprisonment for spousal sexual battery, and twenty-five years' imprisonment for kidnapping, all to run concurrently.

Bryan filed a direct appeal of his convictions and sentences pursuant to *Anders v. California*, 386 U.S. 738 (1967), and this court dismissed the appeal. *See State v. Bryan*, 2010-UP-136 (S.C. Ct. App. filed Feb. 22, 2010).

Bryan then filed a PCR application that included allegations of ineffective assistance of counsel for admitting Bryan's guilt to certain conduct, for not ensuring he made a knowing and voluntary waiver of the right to testify, and for failing to object to vouching by an expert witness. The PCR court granted Bryan a belated direct appeal pursuant to *White v. State*, 263 S.C. 110, 208 S.E.2d 35 (1974), specifically regarding whether his decision not to testify at trial was knowingly and voluntarily made. The PCR court otherwise denied his application. Bryan filed a petition for a writ of certiorari as well as a brief addressing the belated direct appeal issue, pursuant to *Davis v. State*, 288 S.C. 290, 342 S.E.2d 60 (1986). The State also filed a petition for a writ of certiorari arguing the grant of a belated direct appeal was improper. This court granted each party's petition in part. It granted the State's petition to review the PCR court's grant of a belated appeal. This court also granted Bryan's petition to review the PCR court's denial of his claims regarding ineffective assistance of counsel as to the admission of guilt and improper bolstering by an expert witness. We affirm in part, reverse in part, and remand.

## STANDARD OF REVIEW

"Our standard of review in PCR cases depends on the specific issue before us. We defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them. We review questions of law de novo, with no deference to trial courts." *Smalls v. State*, 422 S.C. 174, 180-81, 810 S.E.2d 836, 839-40 (2018).

## LAW/ANALYSIS

### I. The State's Petition—Belated Review of Direct Appeal

The State argues the PCR court erred by granting Bryan a belated direct appeal because the relief granted was not the appropriate remedy. We agree.

Following Bryan's convictions, his appellate counsel timely filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing the trial court erred in allowing Bryan's two minor children to testify against him outside of his presence. Bryan also filed a pro se brief. This court dismissed Bryan's appeal and granted his appellate counsel's motion to be relieved. Bryan filed a pro se petition for writ of certiorari to our supreme court, and the supreme court dismissed his petition. *See*

*State v. Bryan*, S.C. Sup. Ct. Order dated May 26, 2010.[2]  Bryan then filed a petition for writ of certiorari with the United States Supreme Court, which it denied.

Following the denial of his petition to the United States Supreme Court, Bryan filed his PCR application.  At the PCR hearing, Bryan asserted his right to testify was violated at trial under the Fifth, Sixth, and Fourteenth Amendments.  Bryan argued he was challenging the violation "as ineffective assistance of counsel and under the constitutional structural error."

The PCR court granted Bryan a belated appeal, finding the record was unclear as to whether Bryan knowingly and intelligently waived his right to testify because trial counsel "merely" stated to the trial court that Bryan did not want to testify and that the trial court did not need to interview him.  The PCR court observed the issue was not briefed in appellate counsel's original appeal and "[t]he State produced no evidence as to why the issue was not addressed."  The PCR court determined "the failure to address this issue on appeal without explanation to the court is ineffective assistance of appellate counsel" and granted Bryan a belated appeal on the sole issue of whether Bryan was properly apprised of and waived his right to testify.

The PCR court erred by granting Bryan a belated direct appeal.  After a trial, counsel for a defendant is required to make certain that the defendant is fully aware of his right to appeal.  *White v. State*, 263 S.C. 110, 118, 208 S.E.2d 35, 39 (1974). "*White v. State* [relief] is limited to situations where the PCR applicant did not knowingly and intelligently waive his right to a direct appeal." *Douglas v. State*, 369 S.C. 213, 215, 631 S.E.2d 542, 543 (2006).

Because Bryan pursued a direct appeal, both through the assistance of appellate counsel and by filing a pro se brief, Bryan was not denied his right to appeal and is not entitled to relief pursuant to *White*.  *See Legge v. State*, 349 S.C. 222, 224 n.1, 562 S.E.2d 618, 619 n.1 (2002) ("[T]he PCR court's grant of the issue pursuant to *White v. State* is in error because petitioner in fact had an appeal . . . . *White v. State* is inapplicable because it provides the right to a *belated* appeal when the applicant did not knowingly and intelligently waive his right to an appeal.").

---

[2] The supreme court stated it will not entertain petitions for writs of certiorari following this court's dismissal pursuant to *Anders*.

The State further argues the PCR court's decision underlying the grant of a belated appeal was erroneous.  We agree.

The PCR court found appellate counsel was ineffective for failing to brief the issue of whether Bryan knowingly and intelligently waived his right to testify.  However, the record fails to support such a finding.  After the State rested, the trial court inquired:

> [Trial court]:  All right.  [Trial counsel], do–do I need to interview [Bryan] with regard to his right to testify or not to testify?
>
> (Sotto voce discussion between [trial counsel] and [Bryan].)
>
> [Trial counsel]:  Your Honor, you do not need to interview [Bryan].  I have talked to [Bryan] about him testifying and not testifying, and he is not testifying.

The record reflects Bryan was present with counsel, was able to confer with counsel, and remained silent before the court when faced with the question of his desire to testify in his own defense thereby indicating his waiver was voluntary.  *See Brown v. State*, 317 S.C. 270, 272, 453 S.E.2d 251, 252 (1994) ("An on-the-record waiver of a constitutional or statutory right is but one method of determining whether the defendant knowingly and intelligently waived that right."); *Pittman v. State*, 337 S.C. 597, 599, 524 S.E.2d 623, 625 (1999) ("A defendant's knowing and voluntary waiver of the constitutional rights which accompany a guilty plea 'may be accomplished by colloquy between the [trial c]ourt and the defendant, between the [trial c]ourt and defendant's counsel, or both.'" (quoting *State v. Ray*, 310 S.C. 431, 437, 427 S.E.2d 171, 174 (1993)); *Smith v. Robbins*, 528 U.S. 259, 288, (2000) ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal. . . . [I]t is still possible to bring a *Strickland*[3] claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent.").  Furthermore, the right to testify issue was not objected to at trial as trial counsel and the trial court appeared to have been working in concert in

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

obtaining the waiver.  Consequently, appellate counsel would have reasonably understood the matter to be unpreserved.  *See Legge*, 349 S.C. at 225, 562 S.E.2d at 620 (finding that "[b]ecause the issue would not have been preserved for appeal [due to lack of objection at trial], appellate counsel cannot be ineffective for failing to raise the issue").

## II.  Bryan's Petition

### A.      Ineffective Assistance of Counsel – Improper Bolstering

Bryan argues the PCR court erred by finding trial counsel was not ineffective for failing to object to Dr. Ross's testimony regarding Victim's testimony being consistent with that of a victim of the abuse.  We agree.

"In order to establish a claim of ineffective assistance of counsel, a PCR applicant must prove that trial counsel was deficient and that this deficiency prejudiced him." *Martin v. State*, 427 S.C. 450, 454-55, 832 S.E.2d 277, 279 (2019).  "The PCR applicant 'must show trial counsel's performance fell below an objective standard of reasonableness.'"  *Id*. at 455, 832 S.E.2d at 279 (quoting *Matthews v. State*, 350 S.C. 272, 275, 565 S.E.2d 766, 768 (2002)).  "Prejudice may be found where counsel's deficiency undermined confidence in the outcome of the trial."  *Id*.

"It is axiomatic that the credibility of the testimony of . . . witnesses is for the jury."  *State v. Wright*, 269 S.C. 414, 417, 237 S.E.2d 764, 766 (1977).  "[T]he central point of the prohibition against improper bolstering [is that] a witness may not give an opinion for the purpose of conveying to the jury—directly *or indirectly*—that she believes the victim."  *Briggs v. State*, 421 S.C. 316, 324, 806 S.E.2d 713, 717 (2017) (emphasis added).  In determining whether counsel was ineffective for failing to object to improper bolstering, the court must look to the prevailing law on the issue as it stood at the time of trial, without the benefit of hindsight.  *See id*. at 322, 806 S.E.2d at 717 ("[W]e may not judge the reasonableness of counsel's performance by standards that developed later.  'A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" (quoting *Strickland*, 466 U.S. at 689)).

At the PCR hearing, trial counsel explained the law had changed since Bryan's conviction and "now our [s]upreme [c]ourt has gone to efforts to make sure that

experts cannot give opinions, cannot bolster, if you will, a witness'[s] testimony." The PCR court found trial counsel was not ineffective for failing to object to purported bolstering by Dr. Ross because Dr. Ross's testimony did not impermissibly bolster Victim's testimony.  The PCR court found Dr. Ross had testified Victim's symptoms were consistent with those of a woman who had been a victim of domestic violence or was suffering from post-traumatic stress response, not that she believed Victim or that Victim testified credibly.

Prior to Bryan's trial, our courts had found certain descriptors constitute improper vouching regarding an abuse victim's disclosure.  In *State v. Dawkins*, our supreme court found that it was improper for a solicitor to ask an expert witness whether a victim's symptoms were "genuine."  297 S.C. 386, 393, 377 S.E.2d 298, 302 (1989).[4]  In *State v. Dempsey*, 340 S.C. 565, 568, 532 S.E.2d 306, 308 (Ct. App. 2000), this court found asking an expert's witness whether there were any "abnormal" responses from the victim to indicate he was not telling the truth was improper along with the expert's statement that when a child says they have been sexually abused that is the truth "ninety-five to ninety-nine percent of the time."[5] *See also State v. Jennings*, 394 S.C. 473, 480, 716 S.E.2d 91, 94 (2011) (decided after 2008 but finding improper vouching when forensic interviewer indicated child provided a "compelling disclosure" of abuse).

Our courts have allowed expert testimony generally regarding the psychological effects on victims of such violence.  In *State v. Anderson*, the supreme court explained:

> Certainly[,] we recognize that there is such an expertise: this is the type of expert who can, for example, testify to the behavioral characteristics of sex abuse victims.  The better practice, however, is not to have the individual who examined the alleged victim testify, but rather to call an independent expert.  To allow the person who

---

[4] In *Dawkins*, the witness was asked, "'Based on your examination and your observations of [the victim], are you of the impression that her symptoms are genuine?', to which the doctor answered, 'yes.'"  297 S.C. at 393, 377 S.E.2d at 302.
[5] Both *Dawkins* and *Dempsey* were decided in the context of determining whether a motion for mistrial was properly denied.  In both cases, the court found the offending questions inappropriate but affirmed the denial of motion for mistrial when an objection was made and sufficient curative instruction was given.

examined the child to testify to the characteristics of victims runs the risk that the expert will vouch for the alleged victim's credibility.

413 S.C. 212, 218-19, 776 S.E.2d 76, 79 (2015) (citations omitted); *see also State v. Brown*, 411 S.C. 332, 345, 768 S.E.2d 246, 253 (Ct. App. 2015) (finding expert who "merely offered reasons why children might delay disclosing instances of sexual abuse" and "offered admissible expert testimony regarding the general behavioral characteristics of child sex abuse victims" did not improperly vouch for victim's credibility, *abrogated on other grounds by State v. Jones*, 423 S.C. 631, 817 S.E.2d 268 (2018)).

While some jurisdictions have concluded expert testimony, under appropriate circumstances, that a victim's behavior or testimony is consistent with a victim of abuse is admissible, others have concluded it constitutes improper vouching.[6]  In

---

[6] *Compare Atkins v. State*, 533 S.E.2d 152, 154 (Ga. Ct. App. 2000) (concluding pediatrician who testified "medical history given by the victim was consistent with what she would expect from a victim of molestation" did not constitute improper vouching); *Perez v. State*, 313 P.3d 862, 870 (Nev. 2013) ("Although an expert may not comment on whether that expert believes that the victim is telling the truth about the allegations of abuse, . . . Nevada law allows an expert to testify on the issue of whether a victim's behavior is consistent with sexual abuse, if that testimony is relevant."); *State v. Stancil*, 559 S.E.2d 788, 789 (N.C. 2002) ("[A]n expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith."); *with State v. Favoccia*, 51 A.3d 1002, 1024-26 (Conn. 2012) (finding trial court abused its discretion in permitting expert to "testify about the complainant's behaviors being consistent with those generally characteristic of sexual assault victims" because "although an expert witness may testify generally about the behavioral characteristics of child sexual assault victims, an expert witness may not opine about whether the specific complainant has exhibited such behaviors"); *State v. Dudley*, 856 N.W.2d 668, 677-78 (Iowa 2014) ("To allow an expert witness to testify a child's physical manifestations or symptoms are consistent with sexual abuse trauma or CSAAS allows the expert witness to indirectly vouch that the victim was telling the truth because the expert opines the symptoms are consistent with child abuse."); *Commonwealth v. Quinn*, 15 N.E.3d 726, 731 (Mass. 2014) ("[A]n expert may not opine that the child's

*State v. Perry*, 420 S.C. 643, 665, 803 S.E.2d 899, 910-911 (Ct. App. 2017), *rev'd, on other grounds by* 430 S.C. 24, 842 S.E.2d 654 (2020), this court determined an examining physician's response to whether a victim's normal examination was "consistent with [victim] having experienced sexual abuse," did not constitute improper vouching. The court acknowledged the question was "inartfully worded," but the crux of the question was whether a victim's normal physical examination could rule out the possibility of sexual abuse in a case with delayed disclosure. *Id*. at 665, 803 S.E.2d at 911. Such inquiry and response, particularly in the context of the entirety of the witness's testimony, did not improperly comment on the victim's veracity. *Id*.

In this case, Dr. Ross's testimony was specific to Victim and referenced the specific charges against Bryan. Dr. Ross not only testified that Victim's conduct was "consistent with" a victim of domestic violence, she gave her opinion that when she watched Victim's in-court testimony, Victim was "re-traumatized" by "reliving all these events."[7] Regarding Victim's failure to call police, Dr. Ross stated, "It's consistent because part of the trauma is—especially after being choked [and] being raped, she's in shock." The solicitor inquired if Victim's behavior was inconsistent with a "victim of domestic violence, who's been kidnapped by her spouse, or has been raped by her spouse" to which Dr. Ross stated, "No, sir." Her testimony can only be construed as her finding Victim credible.

Even in 2008, this testimony should have sufficiently concerned trial counsel to raise an objection. While the law in the area of expert witness bolstering has evolved since,

> trial counsel should know to object—absent a valid trial strategy—when a [an expert witness] gives testimony that indicates the witness believes the victim, but does not serve some other valid purpose. When the testimony

behavior or experience is consistent with the typical behavior or experience of sexually abused children.").

[7] Dr. Ross testified she interviewed Victim as part of the intake process at Sistercare, a nonprofit service that aids domestic violence survivors and their children, further blurring the line that she was speaking in generalities about victims of domestic abuse.

> directly conveys the witness's opinion that the victim is
> telling the truth, it is obviously improper bolstering.

*Briggs*, 421 S.C. at 325, 806 S.E.2d at 718.

"[T]here is 'no defensible basis for trial counsel's failure to challenge' the testimony of a forensic interviewer given for the purpose of revealing—directly or indirectly—the witness's opinion as to the credibility of the victim." *Id.* at 324-25, 806 S.E.2d at 718 (quoting *Smith v. State*, 386 S.C. 562, 564, 689 S.E.2d 629, 630 (2010)).

Having determined Dr. Ross's testimony constituted improper vouching and trial counsel was deficient for failing to object, we must determine if the improper bolstering prejudiced Bryan. To establish prejudice, a PCR applicant must show "there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different." *Ard v. Catoe*, 372 S.C. 318, 331, 642 S.E.2d 590, 596 (2007). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[T]he strength of the State's case in the PCR court's analysis of prejudice . . . is one significant factor the court must consider—along with the specific impact of counsel's error and other relevant considerations—in determining whether the applicant has met his burden of proving prejudice." *Smalls v. State*, 422 S.C. 174, 190, 810 S.E.2d 836, 844 (2018). "In jurisdictions such as South Carolina, where a jury must return a unanimous verdict to convict, the prejudice prong of *Strickland* is met where 'there is a reasonable probability that at least one juror would have struck a different balance.'" *Hope v. Cartledge*, 857 F.3d 518, 524 (4th Cir. 2017) (quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)).

Victim and the children testified regarding what transpired at their home over the days in question. However, Victim's testimony was the exclusive evidence as to the spousal sexual battery charge. In such an instance, the supreme court has concluded improper bolstering of a victim's testimony is prejudicial. *See State v. Chavis*, 412 S.C. 101, 110, 771 S.E.2d 336, 341 (2015) ("The determination whether a bolstering error is harmless depends on whether the case turns on the credibility of the victim.").

Regarding the CDVHAN charge, Victim testified Bryan choked her and threatened her with a knife. C.B. testified that when he got out of bed Saturday night, he saw Bryan choking Victim. However, no physical evidence of the altercation was

presented and C.B.'s testimony alone, while relevant, is insufficient to satisfy the other overwhelming evidence of guilt requirement when Victim's own testimony was tainted by Dr. Ross's improper bolstering. *See Thompson v. State*, 423 S.C. 235, 250, 814 S.E.2d 487, 495 (2018) ("The properly admitted evidence of Petitioner's guilt was not strong enough to overcome trial counsel's failure to object to [the expert's] inadmissible bolstering testimony.").

As to the kidnapping charge, both children testified the phone was not working Friday night when they tried to use it. The children also testified Bryan stopped them from going to the neighbor's house to use the phone. The children corroborated Victim's testimony she eventually repaired the cut phone line by matching up the wires and taping the line together a few days later. Officer Setree testified that when he went to the home after Bryan was arrested, the phone line appeared to have been repaired with tape. These testimonies support a conclusion, independent of Dr. Ross's bolstering, that Bryan cut the phone line Friday evening. Again, this is relevant evidence Bryan intended to isolate Victim; however, the bulk of evidence he kidnapped her was Victim's own testimony.

She testified he grabbed her arm and told her she could not leave Saturday night and that he made her sleep in the bed with him. Victim also testified she was too intimidated to leave, even when Bryan left the home; testimony necessarily entangled with Dr. Ross's expert opinion about the mindset of "a woman who's been a victim of domestic violence, who's been kidnapped by her spouse, or has been raped by her spouse." Considering the strength of the State's case against the impact of counsel's error in failing to object to Dr. Ross's bolstering, we conclude there is a reasonable probability at least one juror would have "struck a different balance." *See Hope*, 857 F.3d at 524 ("In jurisdictions such as South Carolina, where a jury must return a unanimous verdict to convict, the prejudice prong of *Strickland* is met where 'there is a reasonable probability that at least one juror would have struck a different balance.'" (quoting *Wiggins*, 539 U.S. at 537)); *see Smalls*, 422 S.C. at 194-95, 810 S.E.2d at 847 (discounting tainted evidence when evaluating the strength of the State's case against the impact of counsel's error).

### B.    Ineffective Assistance of Counsel – Admission of Guilt

Bryan's remaining issue in his PCR appeal—that trial counsel was ineffective for admitting Bryan hit Victim and violated an order of protection—is without merit.

During closing arguments trial counsel stated:

Because I think it's fairly evident that he did hit her. But when you're dealing with these charges, these criminal charges, because when you hit someone, it doesn't make you guilty of two counts of sexual battery. It doesn't make you guilty of kidnapping. It doesn't make you guilty of violation of an order of protection. It's doesn't make you guilty of a CDVHAN. It may make guilty of an order of protection, and it may make you guilty of a criminal domestic violence, or a simple CDV.

Trial counsel continued, "You're not evaluating my client saying that he shouldn't hit his wife . . . . You're making a determination whether or not he committed sexual battery, and whether or not he committed kidnapping."

At the PCR hearing trial counsel testified "[t]he trial strategy was to indicate that no one should believe that [Bryan] was guilty of kidnapping because she easily could have gone somewhere else." Trial counsel further explained the concession that Bryan may be guilty of CDV for hitting Victim [in the car] explained Victim's statement to Bryan in a cell phone video[8] that she wanted him to stop hitting her; not that he had abused her over the course of the weekend.

"Where counsel articulates a valid reason for employing a certain strategy, such conduct will not be deemed ineffective assistance of counsel." *Solomon v. State*, 347 S.C. 635, 637, 557 S.E.2d 666, 667 (2001)). In *Solomon*, the supreme court found trial counsel was not ineffective for failing to object to the omission of a "not guilty" option on the verdict form. In that case, trial counsel emphasized the defendant's willingness to take responsibility for strong arm robbery based on the evidence presented and argued against the greater charge of armed robbery. *id*. at 638-39, 557 S.E.2d at 668. The court concluded this approach constituted a valid trial strategy under the circumstances of that case and trial counsel was therefore not ineffective. Likewise, we conclude trial counsel articulated a valid trial

---

[8] A video taken on Bryan's cell phone on Saturday was admitted at trial. According to the record the video was taken by Bryan and he can be heard asking Victim what she wants to which Victim replies she wants Bryan to "not hit her anymore." She also answers in the affirmative when Bryan asks if she wants a divorce. This video is not part of the appendix submitted with the appeal of the PCR court's order.

strategy in this case and affirm the PCR court's finding trial counsel's performance was not deficient.

**CONCLUSION**

Based on the foregoing, we reverse the PCR court's grant of a belated *White* appeal, affirm the PCR court's finding trial counsel was not ineffective for admitting Bryan's guilt as to some conduct as part of a valid trial strategy, and reverse the PCR court's finding trial counsel was not deficient for failing to object to Dr. Ross's testimony as improper vouching.  Because Bryan was prejudiced by this deficiency, this case is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**THOMAS, KONDUROS, and GEATHERS**, JJ., concur.